[No. A090561. First Dist., Div. Three. July 12, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO DWAYNE GRIFFIN et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

742

## COUNSEL

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant Mario Dwayne Griffin.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Tyrone Dushawn Griffin.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

HORNER, J.*—After joint jury trial of brothers Mario Dwayne and Tyrone Dushawn Griffin, Mario was convicted of first degree burglary, felonious assault, and two counts of vandalism, and Tyrone was convicted of first degree burglary and one count of vandalism.[1] Mario appeals from his conviction and sentence on the grounds that: (1) the trial court failed to correctly instruct the jury regarding the elements of the offense; (2) the court

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] In this joint appeal, we will refer to the brothers individually by their first names, and collectively as appellants.

failed to instruct the jury that it must agree upon which felony appellant intended when he entered the victim's apartment; and (3) there is insufficient evidence that he intended to steal or commit any felony when he entered the subject apartment. Tyrone appeals from his conviction and sentence on the grounds that: (1) there is insufficient evidence that he committed or aided and abetted a burglary; (2) the jury was inadequately instructed regarding relevant burglary principles; and (3) there is insufficient evidence that he committed vandalism. We disagree with appellants in all respects and affirm the judgments.[2]

## INTRODUCTION

*Procedural Background.*

By information filed in the Superior Court of Humboldt County on October 27, 1999, appellants were charged with felony violations of Penal Code sections 459 and 460 (first degree burglary of a residence; counts 1 and 4), 207, subdivision (a) (kidnapping; counts 2 and 3), 245, subdivision (a)(1) (assault by means of force likely to produce great bodily injury; count 5), and misdemeanor violations of Penal Code section 594, former subdivision (b)(4) (misdemeanor vandalism; counts 6 and 7).[3] The information further alleged that Mario had a prior felony conviction qualifying as a "strike" under sections 667, subdivisions (d) and (e), and 1170.12, subdivisions (b) and (c), and that he had served three prior prison terms within the meaning of section 667.5, subdivision (b). The information was amended on December 30, 1999, to allege that Mario had a prior felony conviction within the meaning of section 667, subdivision (a)(1). Appellants pled not guilty to all counts and Mario denied the enhancement allegations.

Trial began on January 3, 2000, and the jury returned its verdicts on February 2, 2000. Mario was found guilty of the first degree burglary charged in count 1, the felonious assault count, and the two counts of misdemeanor vandalism. Tyrone was found guilty of the first degree burglary charged in count 1 and the misdemeanor vandalism charged in count 7. Mario waived jury trial on the enhancement allegations and, on February 8, 2000, the trial court found not true all special allegations against Mario, except for one prior prison term enhancement allegation under section 667.5, subdivision (b).

On March 6, 2000, Mario was sentenced to state prison for a total term of seven years on account of the felonies, plus a consecutive year for the prior

---

[2]We jointly address appellants' claims that their burglary convictions were not supported by substantial evidence (Mario's argument 3 and Tyrone's argument 1) and that the court inadequately instructed the jury regarding the elements of burglary (Mario's argument 1 and Tyrone's argument 2).

[3]All further statutory references are to the Penal Code.

prison term enhancement, and an additional 150 days in county jail on account of the misdemeanors. On March 15, 2000, the trial court sentenced Tyrone to a term of six years in state prison, suspended, with a grant of probation for a period of five years on the condition that he serve one year in the county jail, on account of the felony, and an additional 30 days on account of the misdemeanor.

Appellants filed timely notices of appeal.

*The People's Case.*[4]

Sometime in September of 1999, appellants and Willis (Trey) Allcut brought three large trash bags full of marijuana to the home of Trey's girlfriend, Libby Brown, where they hung it to dry. On the morning of September 24, 1999, Trey instructed Libby's roommate, Cassidy Hess, to call appellants and tell them that the drug task force had seized the marijuana in a raid and that Libby had been arrested. Trey and Libby then took the marijuana to someone else's house, without informing appellants.

As instructed by Trey, Cassidy called Tyrone and told him the fabrication regarding the police raid on Libby's house. About 20 minutes later, Tyrone came to the house with his girlfriend, Jennifer, who informed Cassidy that they did not believe her story. Tyrone and Jennifer left after about 10 minutes and, approximately 15 minutes later, Mario arrived at the house, which he proceeded to ransack in search of the marijuana. While there, Mario had an angry telephone conversation with Trey regarding the whereabouts of the marijuana. After Mario left the house, Cassidy went to a neighbor's house, where she made arrangements for Libby to pick up her and her children. Libby and Cassidy then proceeded to the Discovery Inn where they rented a motel room. Two of Cassidy's friends came to the motel room—one borrowed her car and the other drove Cassidy and her children to another town. When Cassidy eventually recovered her car, two of its tires had been "popped."

Later, Libby's friend, Stephanie Roberts, came to the motel room and offered to let Libby stay at her apartment. The two drove each other's cars to Stephanie's apartment and parked them in the lot adjacent thereto. About an hour after arriving at Stephanie's apartment, Stephanie heard voices outside the apartment and heard someone say, "Open the door bitch." Appellants then entered the apartment through the front door, which was unlocked.

---

[4]Mario presented no evidence in his defense. As conceded in Tyrone's brief, the limited evidence he presented at trial has "no relevance to the issues on appeal," and will not be summarized herein.

When appellants entered the apartment, one of them took some keys off a hook in the living room and Mario tore some pages out of Stephanie's day planner. Mario then proceeded to the bathroom and asked Libby where Trey was. When Libby denied knowledge of Trey's whereabouts, Mario shoved Libby against the wall and threatened to restrain her with duct tape, which he had in his possession. Tyrone, who was carrying a piece of metal resembling a tire iron, blocked Stephanie from proceeding toward the bathroom. When Mario came out of the bathroom with Libby, Stephanie attempted to calm him down, but he grabbed her, threw her against the wall and threatened to throw her out the window. Stephanie then offered to help appellants locate Trey.

When Trey did not return their attempts to page him, appellants ordered Stephanie and Libby to leave with them in Stephanie's car. As the group walked by Libby's car, Mario told Libby to look at her tires. Stephanie remembered one of the appellants saying to Libby, "[Y]our tires don't look so good." When Libby asked what had happened to the tires, appellants just laughed. The group then left in Stephanie's car, with Stephanie driving to various places directed by appellants.

One of the group's first stops was at a house where a woman named Tia lived. Once there, appellants hid behind Stephanie's car and directed Libby to determine whether Trey was in the house. While waiting for Libby to return, Stephanie saw Mario kneel down beside Cassidy's car, which was parked out front. Mario later said that he had slashed Cassidy's tires. Although Trey was present in Tia's house, Tia's husband and Libby both told appellants that he was not.

Appellants, Libby, and Stephanie subsequently proceeded to an apartment occupied by Amber Brannon and Tiffany Menniweathers. In response to his inquiries, Tiffany told Mario that she did not know where Trey was. When another individual subsequently informed Mario that Tiffany did know Trey's whereabouts, the foursome returned to her apartment, where Mario fought with Tiffany and struck her several times. Amber called 911 as a result of the incident, but appellants had departed with Libby and Stephanie prior to the arrival of the police.[5]

Based on Amber's identification, the investigating police officer, Peter Cress, was able to locate appellants, Libby, and Stephanie approximately a half an hour later at a gas station, where the group had stopped to buy some beer. At that time, Stephanie told Officer Cress that she was not driving appellants around "of her own free will." She also showed the officer the roll

---

[5] A tape recording of this 911 call was played for the jury.

of duct tape and told him that appellants had threatened to restrain her and Libby with it if they did not help them. She further informed him that appellants had come to her apartment, pushed Libby against the wall and threatened to push Stephanie out of her second-story window. Stephanie and Libby refused, however, to go to the police station to give statements, and Officer Cress allowed the women to leave with the car and appellants to leave on foot. After departing from the gas station, Stephanie and Libby found appellants and let them back in the car out of fear that appellants would otherwise try to hurt them or their family.

The foursome then proceeded to the previously rented motel room, where appellants searched for the marijuana. From there, Stephanie paged Trey, who responded with a telephone call. Mario got on the telephone and began arguing with Trey about the marijuana. Mario told Trey they could meet and "go at it with fists."

Thereafter, the group returned to Stephanie's apartment. After stating that they were going to look for Trey until they found him, appellants left Stephanie at her apartment and drove to their house with Libby in Mario's truck. At 3:21 a.m. on September 25, 1999, Officer Cress went to Stephanie's apartment where he found her hysterically muttering, "They took Libby. They took Libby." Later that morning, Officer Cress found Libby in Mario's bedroom at his mother's house. When he asked Libby whether she was "doing this against [her] will," Libby started crying and shook her head in the affirmative. Appellants were then arrested. When Libby picked up her car the next day it had four flat tires.

When interviewed by Detective Lawson following his arrest, Mario conceded that he had been looking for Trey the previous day, but claimed that it was because Trey owed him money.[6] He also claimed that he had not been inside Libby's house or Stephanie's house on the day in question. After the interview, Detective Lawson overheard Mario tell Tyrone what he had said during the interview and warn him, "Don't go into details."

Following his arrest, Tyrone was twice interviewed by Detective Lawson.[7] During the interviews, Tyrone conceded that he and his brother had been looking for Trey, but claimed it was because he owed them money. He initially denied going to Libby's house, but later admitted it, claiming that nothing unusual had occurred there. He also admitted that he had been carrying a "nail puller" with him during the evening in question.

---

[6]The tape of Mario's interview was played for the jury.

[7]The tapes of these interviews were also played for the jury.

DISCUSSION

I. *The Trial Court Properly Instructed the Jury Regarding the Elements of Burglary.*

■ The trial court instructed the jury under CALJIC No. 14.50 as follows: "Every person who enters any building with a specific intent to steal, take and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of that property or with the specific intent to commit false imprisonment by violence or menace or assault by means of force likely to produce great bodily injury, felonies, is guilty of the crime of burglary in violation of Penal Code section 459." Appellants contend that, because the jury could have erroneously inferred the satisfaction of the burglary intent element from their alleged intent to find and assault Trey at a place and time separate and distinct from Stephanie's apartment, the trial court had a sua sponte duty to additionally instruct the jury on the legal principle that they must have intended to commit the offense within, or in the immediate vicinity of, Stephanie's apartment. Relying on *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1246-1247 [75 Cal.Rptr.2d 40] (*Kwok*), respondent contends that the trial court had no duty to provide the additional instruction claimed necessary by appellants, because burglary does not require spacial and temporal proximity where, as in this case, entry is made to facilitate the commission of a subsequent crime.

The trial court's instruction under CALJIC No. 14.50 generally tracked the language of section 459. It is well established that the court need only use the statutory language in instructing the jury on the elements of the offense, as long there is no basis to conclude that jurors would have difficulty understanding the elements under the facts of the case. (*People v. Failla* (1966) 64 Cal.2d 560, 565 [51 Cal.Rptr. 103, 414 P.2d 39] (*Failla*); see also *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903] [the trial court must instruct on the general principles of law which are "closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case"].) Appellants do not dispute this principle, but argue that a clarifying instruction was necessary under the facts of this case to prevent the jury from erroneously basing their finding of felonious intent on evidence that they intended to commit assault on Trey at a separate place and time. We disagree.

Section 459 does not require that a burglar intend to commit the target crime in the premises entered. (*Kwok, supra,* 63 Cal.App.4th at pp. 1246-1247; *People v. Ortega* (1992) 11 Cal.App.4th 691, 694 [14 Cal.Rptr.2d

246] (*Ortega*); *People v. Wright* (1962) 206 Cal.App.2d 184, 191 [23 Cal.Rptr. 734].) In *Wright* at page 191, the court held that a burglary is committed "if the intent at the time of entry is to commit the offense *in the immediate vicinity of the place entered* by defendant; if the entry is made as a means of *facilitating* the commission of the theft or felony; and if the two places are so *closely connected* that intent and consummation of the crime would constitute a single and practically *continuous transaction.*" (Italics added.) Appellants interpret the *Wright* holding as establishing three criteria necessary for a burglary conviction when the target crime is not intended to be committed in the entered premises. Two subsequent appellate decisions have rejected appellants' interpretation of *Wright*. (See *Kwok, supra,* at pp. 1246-1247; *Ortega, supra,* at p. 694.) In *Ortega* at pages 695-696, the court ignored the *Wright* factors of spatial and temporal proximity and held that a clarifying burglary instruction was not necessary where the entry was "closely connected" with the intended crime of extortion. In *Kwok* at pages 1246-1248, this court followed the *Ortega* court's rejection of temporal and spatial proximity as *elements* of burglary, noting that "the 'continuous transaction test' and the 'immediate vicinity test' . . . are artifacts of the particular factual contexts of *Wright* [and other cases ascribing thereto]." Finding "no principled way to distinguish extortion from other felonies or from larceny [in the context of an intent to burglarize]," we held that a burglary may be found "if the facts and circumstances of the case permit a reasonable inference that the entry was made *in order to facilitate commission of the subsequent crime*, even though the entry and the subsequent crime 'may not share the attributes of proximity in time and place.' " (*Kwok, supra,* at p. 1247, italics added, quoting *Ortega, supra,* at p. 695.)

Appellants urge us to not to apply the *Ortega* and *Kwok* holdings to the facts of this case, arguing that their application herein would mean that "any entry into a structure while harboring an intent to commit a crime somewhere, at some time in the future is sufficient to meet the requirements of burglary." Again, we disagree. While *Kwok* and *Ortega* have dispensed with the *elemental* requirements of spatial and temporal proximity, they have done so only where the subject entry is "closely connected" with, and is made in order to facilitate, the intended crime. (But see *People v. Wright, supra,* 206 Cal.App.2d at p. 188 [entry merely to rest in preparation for a felony to be perpetrated elsewhere not sufficiently connected with offense to constitute burglary].) The evidence in the instant case showed that, although they did not know where they would ultimately find him, appellants entered Stephanie's apartment for the specific purpose of tracking down Trey in order to assault him. Thus, their entry into the apartment could reasonably be considered closely connected with and made in order to facilitate the intended crime of assaulting Trey. Under *Kwok* and *Ortega*, such circumstances are sufficient to satisfy the elements of a burglary, which were

adequately communicated to the jury by the court's provision of CALJIC No. 14.50.

## II. *A Unanimity Instruction Was Not Required in This Case.*

■ As discussed above, the jury was instructed that appellants were guilty of burglary if they entered a building with the specific intent to steal, to commit false imprisonment by violence or menace, or to commit assault by means of force likely to produce great bodily injury. The court did not instruct the jury that it needed to agree on the basis of the intent in order to return a guilty verdict. Mario contends that, because the specific intent harbored by a defendant when he enters a dwelling is an element of burglary, the court had a sua sponte duty to instruct the jury that it must unanimously agree as to the intent Mario had when he entered Stephanie's apartment. Relying on *Failla, supra,* 64 Cal.2d 560, respondent argues that no unanimity instruction was required because the alternative bases of intent merely constituted alternative means of committing the same offense.

The California Constitution guarantees criminal defendants the right to a unanimous jury. (Cal. Const., art. I, § 16; *People v. Jones* (1990) 51 Cal.3d 294, 321 [270 Cal.Rptr. 611, 792 P.2d 643]; *People v. Sutherland* (1993) 17 Cal.App.4th 602, 611 [21 Cal.Rptr.2d 752].) It has long been the general rule in California, however, that when a single crime can be committed in various ways, jurors are not required to unanimously agree upon the *mode* of commission. (*Sutherland, supra,* at p. 612, citing *People v. Sullivan* (1903) 173 N.Y. 122 [65 N.E. 989], *People v. Chavez* (1951) 37 Cal.2d 656, 671-672 [234 P.2d 632]; and see, e.g., *People v. Pride* (1992) 3 Cal.4th 195, 249 [10 Cal.Rptr.2d 636, 833 P.2d 643].) "It follows that even though the evidence establishes that the defendant employed two or more of the prescribed alternate means, and the jury disagrees on the manner of the offense, there is no infirmity in the unanimous determination that the defendant is guilty of the charged offense." (*Sutherland, supra,* at p. 613.) Specifically with respect to the crime of burglary, our high court has determined that "jurors need not be instructed that to return a verdict of guilty they must all agree on the specific 'theory' of the entry—i.e., what particular felony or felonies the defendant intended at the time—provided they are told they must be unanimous in finding that a felonious entry took place." (*Failla, supra,* 64 Cal.2d at p. 569.)

Mario argues that we should not follow our state Supreme Court's precedent in *Failla, supra,* 64 Cal.2d 560, because (1) it does not meet the federal due process requirements as established in the subsequent decision of the United States Supreme Court in *Schad v. Arizona* (1991) 501 U.S. 624 [111

S.Ct. 2491, 115 L.Ed.2d 555] (*Schad*); (2) it erroneously characterizes alternative intents as different legal "theories"; and (3) it is distinguishable from the instant case because it did not involve an intent to steal as an alternative to an intent to commit a specific felony. We disagree in all respects.

In *Schad, supra,* 501 U.S. at page 645 [111 S.Ct. at page 2504], the Supreme Court held that due process did not require the jury, in convicting the defendant of first degree murder, to agree on one of the alternative statutory theories of premeditated or felony murder. While a majority of the court agreed that due process imposes some limits on the degree to which different states of mind may be considered merely alternative means of committing a single offense, the court could not agree on the extent of those due process limitations or how they should be applied. (*Id.* at pp. 632, 651, 656 [111 S.Ct. at pp. 2497-2498, 2507, 2509-2510].) In delivering the plurality opinion of the court, Justice Souter explained that there can be no single test for determining when two means are so disparate as to exemplify two inherently separate offenses. (*Id.* at pp. 633-637, 643 [111 S.Ct. at pp. 2498-2500, 2503].) Based on the principle that "States must be permitted a degree of flexibility in determining the 'fact[s] necessary to constitute the crime' " (*id.* at p. 638 [111 S.Ct. at p. 2500]), Justice Souter concluded that "[w]here a State's particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate that the State has . . . defined as a single crime multiple offenses that are inherently separate" (*id.* at p. 640 [111 S.Ct. at p. 2501]). Finding, however, that history and widespread practice are not dispositive of the due process issue, Justice Souter then proceeded to address the level of culpability involved in the alternative mental states for first degree murder. (*Id.* at pp. 642-644 [111 S.Ct. at pp. 2502-2503].) As Justice Souter explained, "Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence *could reasonably be found*, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense." (*Id.* at p. 644 [111 S.Ct. at pp. 2503-2504], italics added.) Thus, the court held that federal due process did not require the jury to unanimously agree on one of the statutory theories of premeditated or felony murder. (*Id.* at p. 645 [111 S.Ct. at p. 2504].)

While our high court's decision in *Failla, supra,* 64 Cal.2d 560, did not address the burglary unanimity issue in the context of federal due process, we find no basis to conclude that its holding has been invalidated by the United States Supreme Court in *Schad, supra,* 501 U.S. 624. On the contrary,

the *Failla* holding is fully supported by the reasoning of the *Schad* plurality. Just like Arizona's manner of defining the crime of first degree murder, there can be no dispute that the California's manner of defining burglary, including its alternative bases for the element of intent, has a long history and is in widespread use.[8] Moreover, the *Failla* court's reference to the alternative bases for intent as "theories" of guilt mirrors that of the *Schad* court. In any event, this characterization is largely irrelevant, because the real issue is whether the jury's alternatives for finding intent are "so disparate as to exemplify two [or more] inherently separate offenses." (*Schad, supra,* at p. 643 [111 S.Ct. at p. 2503].) While, as Mario argues, the alternative bases of intent presented to the jury in this case could be considered "quite disparate," if premeditation and felony murder can reasonably be considered moral equivalents, so too can intent to steal, intent to assault by means likely to result in great bodily harm and intent to falsely imprison, at least to the extent that their moral disparity does not bar "treating them as alternative means to satisfy the mental element of a single offense." (*Id.* at p. 644 [111 S.Ct. at pp. 2503-2504].) Thus, the fact that *Failla* did not involve theft as an alternative theory of guilt does not provide a meaningful basis to distinguish it from the facts of the instant case.

Based on the foregoing, we find our high court's reasoning in *Failla, supra,* 64 Cal.2d 560, dispositive of Mario's juror-unanimity claim and hold that the trial court did not err in this regard.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Corrigan, J., concurred.

Appellants' petitions for review by the Supreme Court were denied October 10, 2001.

---

[8]According to Justice Scalia's concurrence in *Schad*, this factor alone would be sufficient to conclude that due process is not offended California's burglary statute. (*Schad, supra,* 501 U.S. at pp. 648-652 [111 S.Ct. at pp. 2506-2507].)

*See footnote, *ante*, page 741.