[No. S076868. May 6, 2002.]

THEODORE L. HAAS, Plaintiff and Respondent, v.
COUNTY OF SAN BERNARDINO et al., Defendants and Appellants.

**COUNSEL**

Alan K. Marks, County Counsel, and Alan L. Green, Deputy County Counsel, for Defendants and Appellants.

Liebert, Cassidy & Frierson, Larry Frierson and Jacqueline Kramer Loveless for California School Boards Association's Education Legal Alliance as Amicus Curiae on behalf of Defendants and Appellants.

Richards, Watson & Gershon, Michael G. Colantuono, Roy A. Clarke, Gabriel K. Coy; Cohen & Goldfried and Robert M. Goldfried for 110 California Cities and the California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Roger Jon Diamond for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—In this case, we consider a due process challenge to the manner in which some counties select temporary administrative hearing officers. The Government Code authorizes counties to appoint hearing officers to preside when a state law or local ordinance provides that a hearing be held or that findings of fact or conclusions of law be made by any county board, agency, commission or committee. (Gov. Code, § 27721.)[1] Exercising this statutory authority, some counties have adopted the practice of selecting temporary administrative hearing officers on an ad hoc basis and paying them according to the duration or amount of work performed. Plaintiff contends this practice gives hearing officers an impermissible financial interest in the outcome of the cases they are appointed to decide, because the officers' prospects for obtaining future ad hoc appointments depend solely on the county's goodwill and because the county, in making such appointments, may prefer those officers whose past decisions have favored the county.[2] We agree. Counties that appoint temporary administrative hearing officers must do so in a way that does not create the risk that favorable decisions will be rewarded with future remunerative work. The ad hoc

[1]Government Code sections 27720 through 27728 generally address hearings before local governmental bodies. Under these provisions, a county may establish "the office of county hearing officer" (id., § 27720) and appoint as "hearing officer, or . . . deputy or assistant hearing officer" any attorney who has been admitted to practice in California for at least five years (id., § 27724). Persons so appointed may, as authorized by ordinance or resolution, conduct hearings, issue subpoenas, receive evidence, administer oaths, rule on questions of law and the admissibility of evidence, and prepare records of proceedings. (Id., § 27721.) "Any other local public entity may contract with the county to employ the services of the county hearing officer." (Id., § 27725.) Alternatively, counties and other local public entities may contract with the state Office of Administrative Hearings for the services of an administrative hearing officer. (Id., § 27727.)

[2]Lower court decisions have touched upon this issue without squarely deciding it. (Linney v. Turpen (1996) 42 Cal.App.4th 763, 770, 775, fn. 10 [49 Cal.Rptr.2d 813] (lead opn. of Haerle, J.); id. at pp. 777-779 (conc. opn. of Phelan, J.); id. at pp. 779-797 (dis. opn. of Kline,

procedure used here does create that risk. We thus affirm the Court of Appeal's decision upholding the superior court's writ of mandate disqualifying the hearing officer.

## BACKGROUND

Plaintiff Theodore L. Haas operates a massage clinic in San Bernardino County (the County) under a license issued by the County. When a deputy sheriff reported that a massage technician had exposed her breasts and proposed a sexual act, the County Board of Supervisors (the Board) revoked Haas's license. Haas timely appealed the notice of revocation, and the Board set the matter for hearing. The notice identified a local attorney, Abby Hyman, as the hearing officer. In his answer to the notice, Haas objected that "the County may not hire its own hearing officer to conduct the hearing, said relationship having created . . . an actual conflict of interest and/or potential conflict of interest in violation of the Due Process Clauses of the Federal and State Constitutions." Haas proposed, instead, that the County contract with the state Office of Administrative Hearings for the services of an administrative law judge (Gov. Code, § 27727; see *ante*, at p. 1020, fn. 1), or that Haas hire the hearing officer. Both suggestions were rejected.

Haas renewed his objection to the hearing officer when the hearing convened. Haas's attorney, Roger Jon Diamond, argued that Hyman had an impermissible financial interest in the case, arising from the manner in which the County had selected and paid her, and moved that she recuse herself. Hyman denied the motion, but nevertheless permitted Diamond to pursue the matter for purposes of making the record.

Diamond briefly inquired into the County's arrangements with Hyman. Hyman stated that she had not previously served as a hearing officer and had been hired to hear only the matter at hand. Deputy County Counsel Alan Green, representing the County, explained that he had hired Hyman to avoid using again the same temporary hearing officer who had already recommended that Haas's license be revoked.[3] Green, who had not previously met Hyman, had selected her based on his coworkers' recommendations and

---

P. J.); *McIntyre v. Santa Barbara County Employees' Retirement System* (2001) 91 Cal.App.4th 730, 735 [110 Cal.Rptr.2d 565].)

[3] Attorney J. David Horspool, acting as a temporary hearing officer under an ad hoc appointment similar to Hyman's, had conducted a prior evidentiary hearing based on the same incident and recommended that Haas's license be revoked. The Board affirmed this decision twice, and the superior court vacated it twice—the first time because the Board had heard the appeal without giving Haas notice of the hearing, and the second time because the Board had not considered the record of the evidentiary hearing, which had in the meantime disappeared.

made the arrangements by calling her personally prior to the hearing. Green explained that he did not negotiate the billing rate with Hyman; instead, he informed her that she would be paid the same rate that county counsel charged the County's internal clients for attorneys' time.[4]

During the course of this discussion, Green volunteered, "The intent is that we will use Ms. Hyman on assignment, as the occasion suggests, in the future if she's interested in doing it and if the case should arise." Diamond pursued the matter with further questions to Green, who several times confirmed that he foresaw employing Hyman in the future on an ad hoc basis. When asked, "Is Ms. Hyman's contract with the County only for this case or for future cases?" Green answered, "It's open-ended as far as that's concerned." When asked, "But the County does anticipate using the services of Ms. Hyman in future cases?" Green answered, "Sure." Hyman had not replaced Horspool, Green explained; instead, he anticipated the County might use either attorney "as their schedules permit." Shortly thereafter the discussion returned to the subject of future employment. Diamond asked Green, "And so certainly you've advised [Hyman] that she might be needed on future hearings." Green responded, "I probably have. I don't recall expressly doing so." When Hyman interjected, "I don't recall that," Diamond asked, "But that's certainly within possibility?" to which Green replied, "Certainly." Diamond then asked, "And she knows that?" Green replied, "I would assume so." (Hyman was, of course, present during this exchange.) To Diamond's further question, "And she's only paid for the work she actually performs; is that right?" Green responded, "In connection with this hearing, correct."

After briefly discussing Hyman's credentials, Diamond asked Green why he did "not select a hearing officer from the Office of Administrative Hearings of the State of California pursuant to Section 12.275[5] of the County Code?" Green answered, tautologically, "Because the County elected to hire a hearing officer independently to serve in this capacity." Diamond then asked, "But you, as the moving party, are, in effect, paying the hearing officer?" Green responded, "So?" When Hyman interjected, "Would you like to split my bill? I don't care," Diamond replied, "The trouble is, we will not be paying for your services in future cases where the County retains your services."

---

[4]Neither Hyman's billing rate nor her contract with the County is in the record. While Diamond invited Green to place the contract in the record, Green instead merely represented that it was "the same basically" as the County's contract with the prior hearing officer, which also does not appear in the record.

[5]"The County of San Bernardino or other local public agency within the County may contract with the Office of Administrative Hearings of the State of California pursuant to California Government Code Section 27727. . . ." (San Bernardino County Code, ch. 27, § 12.275.)

A brief discussion of the motion ensued. Diamond drew analogies to a prosecutor's being permitted to file cases before the judge of his choice, and to Code of Civil Procedure section 170.1, subdivision (a)(6)(C), which provides that a judge shall be disqualified when "a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." "It's not whether there's actual prejudice or bias," Diamond argued, "It's the appearance. I would submit that if you ask ten persons on a street corner whether they would be comfortable at a hearing where the opposing side contracted with the judge, they would feel that that creates the appearance of prejudice even if there's no actual bias or prejudice." Diamond again offered to pay for the hearing officer if the County would contract for one with the state Office of Administrative Hearings. He also inquired whether the office of County Hearing Officer purportedly established by the San Bernardino County Code[6] in fact existed. Green explained that no "independent department" with that title existed; as Green understood the matter, Hyman held the office and had been "retained to serve in that capacity" for purposes of the hearing. Hyman then confirmed that she continued to be privately employed as an attorney, that payment for the hearing would go to her personally rather than to her employer, and emphatically declined to answer the question whether she was "taking time off from [her] work to be here?" Diamond at that point reiterated his objection to Hyman's conducting the hearing, and the hearing proceeded to other matters.

During the hearing, which lasted one hour and 45 minutes, two witnesses were called: the deputy sheriff who reported the violation, and Haas. Haas did not materially challenge the deputy's account of the incident. He did, however, through his attorney, attempt to show that no similar incident had previously occurred at his establishment. He also argued that revocation—the sole penalty authorized in the San Bernardino County Code for such violations—was disproportionately harsh. The hearing officer took the matter under submission and rendered a brief written decision 47 days later recommending revocation.

Haas pursued his administrative appeal, which took the form of a written request for a hearing before the Board. In that request, Haas reiterated his objection to the hearing officer. At the hearing, the Board approved the hearing officer's recommendation.

Haas petitioned for a writ of administrative mandamus. (Code Civ. Proc., § 1094.5.) The superior court granted the writ. The judgment and writ

---

[6]San Bernardino County Code, chapter 27, section 12.271 provides: "There is in the government of the County of San Bernardino the office of County Hearing Officer. The duties of the office are to conduct hearings for the County or any agency thereof with the exception of the Planning Commission."

merely direct the Board, without further explanation, to set aside the decision revoking Haas's license. The transcript of the hearing before the superior court, however, indicates the court accepted Haas's claim that the hearing officer should have recused herself. The court declined to instruct the County how to select a hearing officer but indicated that the use of a state administrative law judge would be acceptable.

The Board appealed, and the Court of Appeal affirmed. The court rejected Haas's argument "that the possibility of the County retaining Hyman as a hearing officer in the future," standing alone, "created a significant pecuniary interest." The court believed that such an interest was too "remote, contingent and slight" to require Hyman's recusal. Nevertheless, the court found a violation of due process in the "totality of the particular circumstances in this case," namely, that "the hearing officer was unilaterally selected, retained and paid by the party threatening deprivation of an adversary's constitutionally protected property rights; the attorney who retained the hearing officer participated in the hearing; and there was a complete absence of any restrictions on the selection of the hearing officer to ensure a reasonable degree of impartiality." Like the superior court, the Court of Appeal declined "to instruct the County as to what procedures and restrictions should be implemented," although it "emphasize[d] [that] such procedures should attempt to insure reasonable impartiality." We granted review.

## DISCUSSION

 The question presented is whether a temporary administrative hearing officer has a pecuniary interest requiring disqualification when the government unilaterally selects and pays the officer on an ad hoc basis and the officer's income from future adjudicative work depends entirely on the government's goodwill. We conclude the answer is yes. To summarize the governing principles, due process requires fair adjudicators in courts and administrative tribunals alike.[7] While the rules governing the disqualification of administrative hearing officers are in some respects more flexible than those governing judges,[8] the rules are not more flexible on the subject of financial interest.[9] Applying those rules, courts have consistently recognized that a judge has a disqualifying financial interest when plaintiffs and prosecutors are free to choose their judge and the judge's income from judging

---

[7]*Goldberg v. Kelly* (1970) 397 U.S. 254, 271 [90 S.Ct. 1011, 1022, 25 L.Ed.2d 287] (administrative tribunals); *In re Murchison* (1955) 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942] (courts).

[8]E.g., *Withrow v. Larkin* (1975) 421 U.S. 35, 47-58 [95 S.Ct. 1456, 1464-1470, 43 L.Ed.2d 712] (permitting some combination of investigative and adjudicative functions in administrative tribunals).

[9]E.g., *Withrow v. Larkin, supra,* 421 U.S. 35, 47 [95 S.Ct. 1456, 1464-1465], and *Gibson v. Berryhill* (1973) 411 U.S. 564, 579 [93 S.Ct. 1689, 1698, 36 L.Ed.2d 488] (both acknowl-

depends on the number of cases handled.[10] No persuasive reason exists to treat administrative hearing officers differently. We consider each of these points in more detail below.

When due process requires a hearing, the adjudicator must be impartial. Speaking of trials before judges, the United States Supreme Court has declared that "[a] fair trial in a fair tribunal is a basic requirement of due process." (*In re Murchison, supra,* 349 U.S. 133, 136 [75 S.Ct. 623, 625].) Speaking of administrative hearings, and articulating the procedural requirements "demanded by rudimentary due process" in that setting, the court has said that, "of course, an impartial decision maker is essential." (*Goldberg v. Kelly, supra,* 397 U.S. 254, 267, 271 [90 S.Ct. 1011, 1020, 1022].)

Of all the types of bias that can affect adjudication, pecuniary interest has long received the most unequivocal condemnation and the least forgiving scrutiny. As the high court explained in *Tumey v. Ohio* (1927) 273 U.S. 510, 523 [47 S.Ct. 437, 441, 71 L.Ed. 749] (*Tumey*), "[a]ll questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. [Citation.] But it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." ██ Thus, while adjudicators challenged for reasons other than financial interest have in effect been afforded a presumption of impartiality (*Withrow v. Larkin, supra,* 421 U.S. 35, 47 [95 S.Ct. 1456, 1464-1465]; see *Aetna Life Insurance Co. v. Lavoie* (1986) 475 U.S. 813, 820 [106 S.Ct. 1580, 1584-1585, 89 L.Ed.2d 823] (*Aetna*)), adjudicators challenged for financial interest have not. Indeed, the law is emphatically to the contrary. The high court has "ma[de] clear that [a reviewing court is] not required to decide whether in fact [an adjudicator challenged for financial interest] was influenced, but only whether sitting on the case . . . ' "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." ' " (*Aetna, supra,* 475 U.S. at p. 825 [106 S.Ct. at p. 1587], quoting *Ward v. Village of Monroeville* (1972) 409 U.S. 57, 60 [93 S.Ct. 80, 83, 34 L.Ed.2d 267] (*Ward*), and *Tumey, supra,* 273 U.S. at p. 532 [47 S.Ct. at p. 444].) "[T]he requirement of due process of law in judicial procedure is

edging that the constitutional rules requiring the disqualification of judges for financial interest also apply to administrative hearing officers).

[10]*Brown v. Vance* (5th Cir. 1981) 637 F.2d 272; *Doss v. Long* (N.D.Ga. 1985) 629 F.Supp. 127, 129; *State ex rel. McLeod v. Crowe* (1978) 272 S.C. 41 [249 S.E.2d 772, 776-777, 778]; *State ex rel. Shrewsbury v. Poteet* (1974) 157 W.Va. 540 [202 S.E.2d 628, 631-632, 72 A.L.R.3d 368].

not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice." (*Tumey, supra,* 273 U.S. at p. 532 [47 S.Ct. at p. 444].)[11]

In *Withrow v. Larkin, supra,* 421 U.S. 35, 47 [95 S.Ct. 1456, 1464], the high court wrote that a claim of bias based on the combination of investigative and adjudicative functions in a state medical board had to "overcome a presumption of honesty and integrity in those serving as adjudicators . . . ." But never, in the years since *Withrow,* has the high court so much as hinted that a litigant seeking to disqualify an adjudicator *for financial interest* must overcome any such presumption. To the contrary, the high court has repeatedly and unambiguously held that courts do not, when faced with a claim of bias arising from financial interest, decide whether the adjudicator was in fact influenced. The standard continues instead to be that set out in *Tumey, supra,* 273 U.S. 510, 532 [47 S.Ct. 437, 444], namely, whether the adjudicator's financial interest would offer a possible temptation to the average person as judge not to hold the balance nice, clear and true. (*Aetna, supra,* 475 U.S. at pp. 824-825 [106 S.Ct. at pp. 1586-1587]; *Connally v. Georgia* (1977) 429 U.S. 245, 249 [97 S.Ct. 546, 548, 50 L.Ed.2d 444].) Indeed, applying this standard in *Liljeberg v. Health Services Acquisition Corp.* (1988) 486 U.S. 847, 865, footnote 12 [108 S.Ct. 2194, 2205, 100 L.Ed.2d 855], the court went so far as to vacate a decision entered by a judge who was not conscious of the circumstances giving a university, on whose board of trustees he served, a financial interest in the case.[12]

■ The rule declared in these civil and criminal cases also applies to administrative proceedings. In this context, the high court has written: "It is

---

[11]The strict rule disqualifying an adjudicator with a pecuniary interest in the outcome of the case has deep roots in our legal tradition. The court in *Tumey, supra,* 273 U.S. 510, 524 [47 S.Ct. 437, 441-442], noted *Bonham's Case* (K.B. 1610) 77 Eng.Rep. 638. In that decision, often cited as establishing the principle that legislative acts are subject to judicial review, Chief Justice Sir Edward Coke concluded that the censors (governing body) of the College of Physicians of the City of London could not simultaneously cite, try, and collect fines from persons charged with practicing medicine without a license, and that an act of Parliament purporting to authorize them to do so was "against common right and reason" and void under the common law principle that no one may be a judge in his own case (*"quia aliquis non debet esse Judex in propria causa"*). (*Bonham's Case, supra,* 77 Eng.Rep. at p. 652.)

[12]While the high court did apply a presumption of impartiality in *Schweiker v. McClure* (1982) 456 U.S. 188, 195 [102 S.Ct. 1665, 1669-1670, 72 L.Ed.2d 1], the court expressly found no financial interest on the part of the challenged adjudicators, who decided disputed Medicare claims. The adjudicators were employees of health insurance companies who administered the Medicare program under contract with the federal government. The facts did not "reveal any disqualifying interest" (*id.* at p. 196 [102 S.Ct. at p. 1670]; see also *id.* at p. 197 [102 S.Ct. at p. 1671]) because all claims allowed by the adjudicator-employees were paid out of a federal trust fund rather than the employers' own funds, as were the adjudicators' salaries and all other costs of claims administration (*id.* at pp. 191, 192, fn. 3 [102 S.Ct. at pp. 1667-1668, 1668]).

sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. . . . It has also come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators.' " (*Gibson v. Berryhill, supra*, 411 U.S. 564, 579 [93 S.Ct. 1689, 1698].) Certainly due process allows more flexibility in administrative process than judicial process, even in the matter of selecting hearing officers. But the rule disqualifying adjudicators with pecuniary interests applies with full force. The high court has taken pains to make this clear, even while holding that due process permits, for example, the combination of investigative and adjudicative functions in administrative proceedings. (*Withrow v. Larkin, supra*, 421 U.S. 35.) An assertion of bias based on that combination of functions, the *Withrow* court explained, needs to "overcome a presumption of honesty and integrity in those serving as adjudicators." (*Id.* at p. 47 [95 S.Ct. at p. 1464].) In contrast, the adjudicator's financial interest in the outcome presents a "situation[] . . . in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." (*Ibid.*) On this point, the court has applied the same rules to administrative hearing officers and judges alike. (See, e.g., *id.* at pp. 46-47 [95 S.Ct. at pp. 1463-1465]; *Gibson v. Berryhill, supra*, 411 U.S. at p. 579 [93 S.Ct. at p. 1698].)

The paradigmatic examples of adjudicators with pecuniary interests in the outcome are (1) adjudicators serving, in effect, as judges of their own cases, and (2) judges whose compensation depends on the result of adjudication. An example of the first type—judging one's own case—is *Aetna, supra*, 475 U.S. 813, 821-825 [106 S.Ct. 1580, 1585-1587], in which the high court vacated a state supreme court decision recognizing the tort of bad faith refusal to pay insurance claims because a member of the court was a plaintiff in actions pending against insurance companies based on that tort theory.[13] Examples of the second type—compensation dependent on the outcome— are *Tumey, supra*, 273 U.S. 510, which condemned a Prohibition Era statute that allowed mayors trying cases to be paid from the fines they assessed, and *Connally v. Georgia, supra*, 429 U.S. 245, which struck down a law paying

---

[13]See also *Gibson v. Berryhill, supra*, 411 U.S. 564, 578-579 [93 S.Ct. 1689, 1697-1698] (a state board of optometry composed exclusively of optometrists in private practice may not adjudicate disciplinary matters against optometrists employed by corporations, because decisions by the board to revoke the latter's licenses would increase business opportunities for board members); *University Ford Chrysler-Plymouth, Inc. v. New Motor Vehicle Bd.* (1986) 179 Cal.App.3d 796 [224 Cal.Rptr. 908] (an administrative board with jurisdiction to settle disputes between automobile dealers and manufacturers does not satisfy due process when the board includes dealers but not manufacturers).

magistrates $5 each for search warrants issued and nothing for warrants withheld.[14]

Another example of outcome-dependent compensation factually closer to the case before us was identified and condemned in the so-called fee system cases.[15] The now obsolete fee system gave magistrates a pecuniary incentive to favor frequent litigants by allowing plaintiffs and prosecutors to pick their magistrate and by compensating magistrates according to the number of cases they decided. The leading case is *Brown v. Vance, supra,* 637 F.2d 272 (*Brown*). In that decision by Judge Wisdom, the Fifth Circuit Court of Appeals held unconstitutional Mississippi's system for compensating justices of the peace. The highest courts of West Virginia and South Carolina had already reached the same conclusion (see *State ex rel. Shrewsbury v. Poteet, supra,* 202 S.E.2d 628, 631-632; *State ex rel. McLeod v. Crowe, supra,* 249 S.E.2d 772, 776-777, 778), and the federal district court would soon thereafter do likewise for the State of Georgia (*Doss v. Long, supra,* 629 F.Supp. 127, 129).

At the time of *Brown, supra,* 637 F.2d 272, Mississippi divided its counties into five districts, each with at least one justice of the peace. Justices of the peace had jurisdiction over misdemeanors occurring in their districts and civil cases involving less than $500 in damages arising anywhere in the county. A prosecutor, typically a highway patrol officer prosecuting a traffic offense, was free to file a complaint before any justice of the peace in the district or any justice in the county if no district justice was available. A civil plaintiff was free to file suit before any justice in the county. Justices were paid $10 for each criminal case, regardless of disposition, and $15 for each civil case, payable by the losing party. (*Id.* at p. 275.) The plaintiffs in *Brown* challenged this fee system as "produc[ing] a temptation to the average man as a judge to favor conviction in criminal cases and judgment for the plaintiffs in civil cases" (*id.* at p. 274) and, thus, as violating due process. More specifically, the *Brown* plaintiffs alleged that, because of the system, "police officers favor[ed] 'convicting judges'; collection agencies and other creditors favor[ed] judges who tend[ed] to decide in their favor." (*Ibid.*)

The lower court in *Brown, supra,* 637 F.2d 272, relying on *Withrow v. Larkin, supra,* 421 U.S. 35, had "concluded that the plaintiffs . . . failed to 'overcome a presumption of honesty and integrity as to those serving as

---

[14]See also *Ward, supra,* 409 U.S. 57 (extending the principle of *Tumey, supra,* 273 U.S. 510, to an adjudicator's official, institutional financial interests and, thus, disqualifying a mayor from serving as judge when fines assessed by his court added to the village's income).

[15]See *ante,* page 1025, footnote 10.

adjudicators.' " (*Brown, supra*, 637 F.2d at p. 283.) This, the Fifth Circuit explained, was "the wrong standard." (*Ibid.*) "We need find no instance of actual judicial bias to hold the fee system constitutionally infirm," the court wrote. "*Tumey* and *Ward* do not require proof of actual judicial prejudice or of a direct pecuniary interest in the outcome of particular cases. The test is whether a fee system presents a 'possible temptation to the average man as judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused.' " (*Id.* at p. 282, quoting *Tumey, supra*, 273 U.S. 510, 532 [47 S.Ct. 437, 444], and *Ward, supra*, 409 U.S. 57, 60 [93 S.Ct. 80, 83].) Because the system created that possible temptation, the *Brown* court continued, the plaintiffs' due process claim was not "refuted by evidence that 'on numerous occasions' some justice court judges have judged fairly." (*Brown, supra*, 637 F.2d at p. 284.) "In *Tumey* and *Ward* the Supreme Court . . . was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges. . . . The Court's inquiry there and our inquiry here is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the fee system vulnerable to a 'possible temptation' to the 'average man' as judge. Here we have no need to be solicitous of the honor of a particular judge; none has been questioned. Nor do concerns of judicial administration necessarily require a high evidentiary barrier. The *Tumey-Ward* test, in sum, is levelled at the system, not the individual judge." (*Ibid.*)

■ The compensation system at issue in the case before us is functionally similar to the system condemned in *Brown, supra*, 637 F.2d 272, and the other fee system cases (*Doss v. Long, supra*, 629 F.Supp. 127; *State ex rel. McLeod v. Crowe, supra*, 249 S.E.2d 772; *State ex rel. Shrewsbury v. Poteet, supra*, 202 S.E.2d 628). Here, as there, the prosecuting authority may select its adjudicator at will, the only formal restriction here being that the person selected must have been licensed to practice law for at least five years. (Gov. Code, § 27724.)[16] Here, as there, while the adjudicator's pay is not formally dependent on the outcome of the litigation, his or her future income as an adjudicator is entirely dependent on the goodwill of a prosecuting agency that is free to select its adjudicators and that must, therefore, be presumed to favor its own rational self-interest by preferring those who tend to issue favorable rulings. Finally, adjudicators selected and paid in this manner, for the same reason here as there, have a "possible temptation . . . not to hold the balance nice, clear and true." (*Tumey, supra*, 273 U.S. 510, 532 [47 S.Ct.

---

[16]"Any county hearing officer, or any deputy or assistant hearing officer, appointed pursuant to this chapter, shall be an attorney at law having been admitted to practice before the courts of this state for at least five years prior to his or her appointment." (Gov. Code, § 27724.)

437, 444]; see *Ward, supra,* 409 U.S. 57, 60, and *Brown, supra,* 637 F.2d at p. 280.)

The teaching of the fee system cases and the high court decisions on which they, in turn, rely is that, to violate due process, the risk of bias caused by financial interest need not manifest itself in overtly prejudiced, automatic rulings in favor of the party who selects and pays the adjudicator. The "possible temptation" (*Tumey, supra,* 273 U.S. 510, 532 [47 S.Ct. 437, 444]) not to be scrupulously fair, alone and in itself, offends the Constitution. That such a temptation can arise from the hope of future employment as an adjudicator is easy to understand and impossible in good faith to deny. One commentator described the subtle bias that can result from an unregulated free market in adjudicative services simply as the adjudicator's recognition that "[s]teady customers represent an important asset to any seller" and the resulting tendency on the adjudicator's part to "give steady customers the benefit of the doubt more often than not." (Note, *The California Rent-a-Judge Experiment: Constitutional and Policy Considerations of Pay-As-You-Go Courts* (1981) 94 Harv. L.Rev. 1592, 1608.)[17] This was precisely the risk of bias to which Haas's attorney alluded in his motion to disqualify the hearing officer in this case. The hearing officer's suggestion that Haas split her fee with the County did not obviate that risk because, as Haas's attorney explained, Haas would "not be paying for [the hearing officer's] services in future cases where the County retains [her] services." In other words, the County rather than Haas would be the repeat customer upon whose goodwill, alone, the hearing officer's prospect for future employment in that capacity depended.[18] This is the same risk of bias that was condemned in the fee system cases. Because the same constitutional principles governing

---

[17]The specific context about which the cited commentator wrote—the trial of civil cases before judicial referees and temporary judges—is now governed by rules designed to eliminate the risk of bias arising from a paid adjudicator's repeated service for the same party. (Cal. Rules of Court, rules 244(c)(2), 244.1(c)(2), 244.2(e)(2).) In addition, the Judicial Council recently adopted, under legislative mandate (Code Civ. Proc., § 1281.85, added by Stats. 2001, ch. 362, § 4), a set of ethical standards for contractual arbitrators (Cal. Rules of Court, appen., div. VI, Ethics Standards for Neutral Arbitrators in Contractual Arbitration, eff. July 1, 2002).

[18]Even though Deputy County Counsel Green unambiguously referred several times to the possibility that Hyman would be offered future employment as a hearing officer (see *ante,* at p. 1022), Justice Brown concludes that "Hyman could not . . . have had any realistic expectation of future retention" because "such services would, in any event, be limited to license appeals on massage cases lasting only a few hours each" and because "at oral argument county counsel indicated there had not been another such hearing in the eight years since this one." (Conc. & dis. opn., *post,* at p. 1040.) In fact, nothing in the record indicates that Green told Hyman, before she made the decision not to recuse herself, that he would consider hiring her only for cases involving massage clinics. Indeed, the statute under which he hired her applies generally to matters in which "a state law or local ordinance provides that a hearing be held or that findings of fact or conclusions of law be made." (Gov. Code,

disqualification for financial interest apply to judges and administrative hearing officers alike, the same conclusion follows: The hearing officer in this case had an impermissible financial interest in the outcome of the litigation arising from the prospect of future employment by the County, measured against the applicable constitutional standard of a "possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true." (*Tumey, supra,* 273 U.S. at p. 532 [47 S.Ct. at p. 444]; see also *Aetna, supra,* 475 U.S. 813, 825 [106 S.Ct. 1580, 1587], and *Ward, supra,* 409 U.S. 57, 60 [93 S.Ct. 80, 83].)[19]

Against this conclusion, the County has very little to say that was not anticipated and rejected in the cases already discussed. The County has devoted much of its argument to the contention that due process does not preclude the government from either paying or selecting hearing examiners. But to consider payment and selection as separate issues is to miss the point. Certainly due process does not forbid the government to pay an adjudicator when it must provide someone with a hearing before taking away a protected liberty or property interest. Indeed, the government must ordinarily pay the adjudicator in such cases to avoid burdening the affected person's right to a hearing. (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 337-357 [84 Cal.Rptr.2d 425, 975 P.2d 622].) Furthermore, no generally applicable principle of constitutional law permits the affected person in such a case to select the adjudicator. Haas does not argue to the contrary. Neither payment nor selection, considered in isolation, is the problem.

The County also argues that any financial interest Hyman may have had in the prospect of future employment as a hearing officer was too slight to require disqualification. ▮ To be sure, the high court has required disqualification only for financial interests that it has characterized as " ' "direct, personal, substantial, [and] pecuniary" ' " rather than "slight." (*Aetna, supra,* 475 U.S. 813, 825-826 [106 S.Ct. 1580, 1587-1588], quoting *Ward, supra,* 409 U.S. 57, 60 [93 S.Ct. 80, 83], and *Tumey, supra,* 273 U.S. 510, 523 [47 S.Ct. 437, 441].) But the precise teaching of the fee system cases is that a direct, personal, and substantial pecuniary interest does indeed exist when income from judging depends upon the volume of cases an adjudicator hears and when frequent litigants are free to choose among adjudicators,

§ 27721.) Nor could Hyman have known, at the time she made her decision, that the possible future employment mentioned by Green would not in fact materialize.

[19]These constitutional principles address the risks inherent in certain systems for selecting adjudicators rather than the ethical behavior of specific participants in those systems. For this reason, the County's assertions that licensed attorneys should be presumed to act ethically when serving as hearing officers, and that no one representing the County attempted to influence the hearing officer in this case, are irrelevant. We have no reason to believe that anyone involved in this proceeding acted unethically.

preferring those who render favorable decisions. In this context, when the danger to be avoided is that the desire for more work will offer a possible temptation to the average person to favor the frequent litigant, even fees of $10 and $15 per case have been considered direct, personal, and substantial. (*Brown, supra,* 637 F.2d 272, 275.) Certainly the amount of money that will induce an attorney to take time away from his or her regular practice of law cannot be dismissed as slight.

Indeed, the types of financial interests that courts have found not to create an unconstitutional risk of bias have been far more indirect, impersonal, and insubstantial than cash paid in hand to the adjudicator with the prospect of more. The high court in *Aetna, supra,* 475 U.S. 813, 825-826 [106 S.Ct. 1580, 1587-1588], for example, found to be "slight" the hypothetical interest of six members of the Alabama Supreme Court as unnamed plaintiffs in an as-yet-uncertified class action on behalf of state employees covered by a health insurer that allegedly withheld payment on valid claims. The justices were, thus, not disqualified from participating in a different case presenting the question whether Alabama would recognize a cause of action for bad faith refusal to pay claims. "With the proliferation of class actions involving broadly defined classes," the high court concluded, "the application of the constitutional requirement of disqualification must be carefully limited. Otherwise constitutional disqualification arguments could quickly become a standard feature of class-action litigation." (*Id.* at p. 826 [106 S.Ct. at p. 1588].) In California, the Court of Appeal in *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 228 [79 Cal.Rptr.2d 910], dismissed as "remote, indirect and uncertain," in the context of a disciplinary appeal, the alleged financial interest of a public member of a city personnel commission arising from the member's sale of gasoline to the city. While the member's financial interest would presumably have disqualified him from participating in decisions involving the purchase of fuel, that interest had no clear effect on his ability to judge a disciplinary matter. The speculative claims of financial interest rejected in these cases cannot fairly be compared with the direct, personal, and substantial financial interest of an adjudicator whose future work in that capacity depends entirely on the goodwill of the party paying the adjudicator's fee.

The County also contends we have not required the disqualification of administrative hearing officers absent a showing of actual bias. Although the contention is accurate with respect to claims of bias arising from a hearing officer's personal or political views, it is erroneous as to claims of bias arising from financial interest. The County bases its argument on *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781 [171 Cal.Rptr. 590, 623 P.2d 151] (*Andrews*), a plurality opinion signed by only

two permanent members of this court. At issue was an agricultural employer's motion to disqualify a private attorney chosen by the Agricultural Labor Relations Board (ALRB) as a temporary administrative hearing officer to decide whether the employer had committed unfair labor practices. The attorney chosen by the ALRB to serve as hearing officer belonged to a public interest law firm that had represented farm workers. Interpreting the relevant statutes and regulations then in effect, the plurality concluded the officer was not subject to disqualification absent a showing of actual bias sufficient to render a fair hearing improbable. (*Id.* at pp. 791-792.)

In reaching this conclusion, the *Andrews* plurality did not purport to address the requirements of due process. There was no need to do so. Personal bias, such as that which can arise from social and political views, is not necessarily of constitutional significance and is, thus, subject to regulation by the state. (*Aetna, supra,* 475 U.S. 813, 820 [106 S.Ct. 1580, 1584-1585]; *Tumey, supra,* 273 U.S. 510, 523 [47 S.Ct. 437, 441].) Thus, the *Andrews* plurality appropriately determined by reference to state statutes and regulations, rather than the due process clause, whether a private attorney was disqualified from serving as a hearing officer because his public interest law firm had previously represented farm workers.

Indeed, the *Andrews* plurality alluded to the requirements of due process only once—to recognize that certain well-defined situations, including an adjudicator's financial stake in the outcome of a dispute, create exceptional situations "in which the probability or likelihood of the existence of actual bias is so great that disqualification of a judicial officer is required to preserve the integrity of the legal system, even without proof that the judicial officer is actually biased towards a party." (*Andrews, supra,* 28 Cal.3d 781, 793, fn. 5, citing *Peters v. Kiff* (1972) 407 U.S. 493, 502 [92 S.Ct. 2163, 2168, 33 L.Ed.2d 83], and *Tumey, supra,* 273 U.S. 510.) In other words, the *Andrews* plurality "specifically recognized actual bias need not be shown when the alleged bias is due to a financial interest in the outcome of the dispute." (*University Ford Chrysler-Plymouth, Inc. v. New Motor Vehicle Bd.,* *supra,* 179 Cal.App.3d 796, 803-804.) This, of course, is precisely the rule mandated by due process in both judicial and administrative proceedings, and the rule by which the high court has repeatedly "[made] clear that [a reviewing court is] not required to decide whether in fact [an adjudicator] was influenced, but only whether sitting on the case . . . ' "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." ' " (*Aetna, supra,* 475 U.S. 813, 825 [106 S.Ct. 1580, 1587], quoting *Ward, supra,* 409 U.S. 57, 60 [93 S.Ct. 80, 83], and *Tumey, supra,* 273 U.S. at p. 532 [47 S.Ct. at p. 444]; see also *Withrow v. Larkin, supra,* 421 U.S. 35, 46-47 [95 S.Ct. 1456, 1463-1465].)

 The County argues that to require the disqualification of hearing officers on account of financial interest without a showing of actual bias would amount to disqualification based on a party's subjective, unilateral perception of bias. The *Andrews* plurality rejected such a standard, reasoning that "a party's unilateral perception of an appearance of bias cannot be a ground for disqualification unless we are ready to tolerate a system in which disgruntled or dilatory litigants can wreak havoc with the orderly administration of dispute-resolving tribunals." (*Andrews, supra,* 28 Cal.3d 781, 792.) But we adopt no such standard by giving full effect to the cases mandating disqualification for financial interest. The appearance of bias that has constitutional significance is not a party's *subjective, unilateral* perception; it is the *objective* appearance that arises from financial circumstances that would offer a possible temptation to the average person as adjudicator. A procedure holding out to the adjudicator, even implicitly, the possibility of future employment in exchange for favorable decisions creates such a temptation and, thus, an objective, constitutionally impermissible appearance and risk of bias. (*Brown, supra,* 637 F.2d 272, 284.)

 The County also contends that any possibility of bias on the part of a hearing officer is cured when the Board independently reviews the administrative record and decides whether to accept or reject the officer's recommendation. The short answer to the contention is that no court has relied on this argument to uphold a decision reached by an adjudicator found to have suffered from a constitutionally significant risk of bias. Indeed, several courts have expressly rejected the argument. The leading case on point is *Ward, supra,* 409 U.S. 57, in which the high court rejected the claim that the unfairness of being subjected to trial by a mayor with a financial interest in assessing fines "can be corrected on appeal and trial *de novo* . . . . We disagree," the high court wrote. "This 'procedural safeguard' does not guarantee a fair trial in the mayor's court; there is nothing to suggest that the incentive to convict would be diminished by the possibility of reversal on appeal. Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. *Petitioner is entitled to a neutral and detached judge in the first instance.*" (*Id.* at pp. 61-62 [93 S.Ct. at pp. 83-84], fn. omitted, italics added.) Courts have followed *Ward*'s conclusion on this point both in fee system cases (*Brown, supra,* 637 F.2d 272, 279; *State ex rel. Reece v. Gies* (1973) 156 W.Va. 729 [198 S.E.2d 211, 216]) and in cases involving administrative tribunals (*Hackethal v. California Medical Assn.* (1982) 138 Cal.App.3d 435, 445-446 [187 Cal.Rptr. 811]).

The plurality in *Andrews, supra,* 28 Cal.3d 781, 794, did suggest that the opportunity for independent review weighed against adopting a hypothetical

rule requiring the disqualification of an administrative hearing officer based on a party's "subjective belief" that the officer was biased. "We . . . fail to see," the plurality wrote, "how a mere subjective belief in the [officer's] appearance of bias, as distinguished from actual bias, can prejudice either party when the [ALRB] is responsible for making factual determinations, upon an independent review of the record." (*Ibid.*) The *Andrews* plurality's dictum on this point is impossible to reconcile with *Ward, supra,* 409 U.S. 57, 61-62 [93 S.Ct. 80, 83-84]. Nor has the *Andrews* dictum been followed even in this state when an adjudicator *was* found to be biased. When a state medical association argued that its own independent review of a licensing matter cured any prejudice due to the involvement of biased adjudicators at a lower level, the Court of Appeal in *Hackethal v. California Medical Assn., supra,* 138 Cal.App.3d 435, 445-446, followed *Ward* rather than *Andrews.*

██ Next, the County contends that any benefit to the adjudicative process that might come from restricting its freedom to choose hearing officers would not justify the increased burden on the County. The County thus invokes the cost-benefit analysis of *Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [96 S.Ct. 893, 903, 47 L.Ed.2d 18] (*Mathews*), in which the high court wrote that the "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

The *Mathews* cost-benefit analysis appears to have no legitimate application in this context. As another court has explained, "[a] *Mathews* balancing test . . . is not the appropriate inquiry when the due process claim involves an allegation of biased decisionmakers. *Mathews* involved only allegations of insufficient procedural safeguards, not allegations of a biased decisionmaker. The *Mathews* court made no comment on the line of cases that indisputably establish the right to an impartial tribunal. [Citations.] Indeed, since *Mathews,* the Supreme Court has had several occasions to consider claims of due process violations based on allegations of a biased decisionmaker; in none of these cases has the Court resorted to the *Mathews* balancing test to resolve that issue." (*United Retail & Wholesale Emp. v. Yahn & Mc Donnell* (3d Cir. 1986) 787 F.2d 128, 137-138, citing *Schweiker v. McClure, supra,* 456 U.S. 188; *Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238 [100 S.Ct. 1610, 64 L.Ed.2d 182]; *Friedman v. Rogers* (1979) 440 U.S. 1 [99 S.Ct. 887, 59 L.Ed.2d 100].) Indeed, the high court in *Schweiker v.*

*McClure* gave the *Mathews* cost-benefit analysis no role in its analysis and rejection of a claim of financial bias, even while applying *Mathews* to the distinct question of whether unsuccessful Medicare claimants were entitled to an additional level of administrative review. (See *ante*, at p. 1026, fn. 12.)

The justification for applying different analyses to the distinct problems of biased adjudicators and inadequate procedures is that "the requirement of an impartial decisionmaker transcends concern for diminishing the likelihood of error." (*United Retail & Wholesale Emp. v. Yahn & Mc Donnell, supra*, 787 F.2d 128, 138.) "[I]f the only problem with biased decisionmakers was the likelihood of error, it would make sense to apply the *Mathews* balancing test in cases involving allegations of biased decisionmakers and to subsume the problem of bias under the 'risk of erroneous deprivation' prong of the three-part test." (*Ibid.*) However, "[t]he unfairness that results from biased decisionmakers strikes so deeply at our sense of justice that it differs qualitatively from the injury that results from insufficient procedures. In Justice Holmes' famous phrase, 'even a dog distinguishes between being stumbled over and being kicked.'" (*Ibid.*, quoting from Holmes, The Common Law (1881) p. 3.)

Joining the County on this point, amici curiae assert that many local governments and school boards appoint temporary hearing officers under similar ad hoc procedures and will incur additional costs and inefficiencies if their own procedures are disapproved as a result of today's decision.[20] We do not consider the constitutional validity of any rule or practice not presently before us. Moreover, speculation about the possible outcome of hypothetical cases cannot justify tolerating a practice that we have considered and found to create a constitutionally unacceptable risk of bias.

In any event, the problem we address here is limited in scope, and constitutional methods for selecting administrative hearing officers are readily available. The problem arises from the lack of specific statutory standards governing temporary hearing officers appointed by counties under Government Code section 27724. Many other administrative adjudicators already work under rules that greatly reduce the specific risk of bias present in this case.[21] Formal proceedings under the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.) are conducted by administrative law judges from the Office of Administrative Hearings (Gov. Code, § 11512,

---

[20]To illustrate the point, amicus curiae 110 California Cities asks us to take judicial notice of portions of the Beverly Hills and Hollywood municipal codes authorizing the appointment of hearing officers. The motion is granted.

[21]Judicial referees and temporary judges are subject to detailed conflict of interest rules, and the Legislature has recently mandated the adoption of ethical rules for arbitrators. (See *ante*, p. 1030, fn. 17.)

subd. (a)), who are subject to the APA's rules governing disqualification (*id.,* §§ 11512, subd. (c), 11425.10, subd. (a)(5), 11425.30, 11425.40) and the disqualification rules set out in the Political Reform Act applicable to all state employees (*id.,* § 87100 et seq.). Informal hearings subject to the APA are sometimes conducted by members of the relevant state agency (*id.,* §§ 11405.80, 11445.40), who are for these purposes subject to the same rules (*id.,* §§ 11425.10, subd. (a)(5), 87100).

The type of hearing at issue here falls under Government Code section 27721, which governs matters not subject to the APA (*id.,* § 11410.30) and in which "a state law or local ordinance provides that a hearing be held or that findings of fact or conclusions of law be made by any county board, agency, commission, or committee . . . ." (*id.,* § 27721). In such matters, the Government Code, itself, offers two methods for obtaining adjudicators that do not necessarily pose the problems created by ad hoc selection. These other methods are (1) establishing the office of county hearing officer (*id.,* § 27720) and (2) contracting with the state Office of Administrative Hearings for an administrative law judge (*id.,* § 27727). The problem we address in this case arises only when counties forgo these options and, instead, hire temporary hearing officers under Government Code section 27724. Because that section imposes only the requirement that a person selected as hearing officer have been licensed to practice law for at least five years, counties by default have much freedom to experiment and to adopt selection procedures adapted to their individual needs.[22] To satisfy due process, all a county need do is exercise whatever authority the statute confers in a manner that does not create the risk that hearing officers will be rewarded with future remunerative employment for decisions favorable to the county. ■ The requirements of due process are flexible, especially where administrative procedure is concerned, but they are strict in condemning the risk of bias that arises when an adjudicator's future income from judging depends on the goodwill of frequent litigants who pay the adjudicator's fee.

---

[22]While we do not require any particular set of rules, or pass judgment on rules not before us, to suggest some procedures that might suffice to eliminate the risk of bias may be helpful. For example, a county that wished to continue appointing temporary hearing officers on an ad hoc basis might adopt the rule that no person so appointed will be eligible for a future appointment until after a predetermined period of time long enough to eliminate any temptation to favor the county. Under such a rule, an attorney might be appointed to hear all cases arising during the designated period. A county that needed more hearing officers might, under similar rules, appoint a panel of attorneys to hear cases under a preestablished system of rotation. None of these options would likely entail significant additional costs. Finally, it bears repeating that counties may use their existing statutory authority to contract with the state for the services of an administrative law judge (Gov. Code, § 27727) or to establish and staff the office of county hearing examiner (*id.,* § 27720).

DISPOSITION

The decision of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., concurred.

**BROWN, J.,** Concurring and Dissenting.—I concur in the majority's decision to affirm the judgment of the Court of Appeal because in the circumstances of this case the personal selection of the hearing officer by the county's attorney—who also prosecuted the matter—was sufficient to cause a reasonable person to doubt the adjudicator's impartiality. (Cf. Code Civ. Proc., § 170.1, subd. (a)(6)(C).) I cannot agree, however, that the present facts warrant the wholesale dismantling of a selection process utilized not only by the county but by local governmental entities throughout the state. (See Gov. Code, § 27721.) While common practice does not ipso facto establish or ensure constitutional validity, I am unpersuaded the rationale of *Tumey v. Ohio* (1927) 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749] and its fee system progeny should straightjacket the analysis here.

In *Tumey v. Ohio, supra,* 273 U.S. at page 523 [47 S.Ct. at page 441], the United States Supreme Court found a due process violation where the mayor-adjudicator had a "direct, personal, substantial pecuniary interest in reaching a conclusion against" one of the parties because only upon conviction would costs be imposed on his behalf. (See also *State ex rel. Reece v. Gies* (1973) 156 W.Va. 729, 737 [198 S.E.2d 211, 215-216].) In addition, the mayor was "charged with the business of looking after the finances of the village" and thus had an interest in the "pecuniarily successful conduct" of the criminal court over which he presided and which generated substantial village revenue through criminal convictions. (*Tumey v. Ohio, supra,* 273 U.S. at p. 533 [47 S.Ct. at pp. 444-445].) The Supreme Court has also allowed that a constitutional violation may arise "when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court [by favoring criminal conviction]. This, too, is a 'situation [as in *Tumey*] in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.' [Citation.]" (*Ward v. Village of Monroeville* (1972) 409 U.S. 57, 60 [93 S.Ct. 80, 83, 34 L.Ed.2d 267].)

Invoking the rationale of *Tumey* and *Ward,* the court in *Brown v. Vance* (5th Cir. 1981) 637 F.2d 272, 276, found a due process violation where "a judge's bread and butter depend[ed] on the number of cases filed in his

court" thereby creating the temptation "to enhance his income by leaning in the direction of conviction in criminal cases [thus currying favor with police officers who decided where to file such matters] and judgment for the plaintiff in civil cases [thus currying favor with creditors who decided where to file their collection actions]." (See also *Doss v. Long* (N.D.Ga. 1985) 629 F.Supp. 127, 129 [following *Brown, supra,* 637 F.2d 272]; *State ex rel. Shrewsbury v. Poteet* (1974) 157 W.Va. 540, 546 [202 S.E.2d 628, 631-632, 72 A.L.R.3d 361].)

The majority acknowledges that a disqualifying pecuniary interest must be direct, personal, and substantial, but makes no attempt to realistically apply this standard rather than an overwrought interpretation of the fee system cases. Indeed, it implies that a due process violation would arise from payment of even $10 or $15 (see maj. opn., *ante,* at pp. 1031-1032), an amount that today would not cover a hearing officer's parking in many cities.[1]

The majority grounds its reliance on the reasoning of *Brown v. Vance, supra,* 637 F.2d 272, on the possibility the county may in some future proceeding again solicit Abby Hyman's services as a hearing officer. This pecuniary interest may be less indirect than in *Dugan v. Ohio* (1928) 277 U.S. 61 [48 S.Ct. 439, 72 L.Ed. 784], in which the mayor's "relationship to the finances and financial policy of the city was too remote to warrant a presumption of bias toward conviction in prosecutions before him as judge." (*Ward v. Village of Monroeville, supra,* 409 U.S. at pp. 60-61 [93 S.Ct. at p. 83].) Nevertheless, on this record, I find it sufficiently speculative and insubstantial to dispel any due process concerns. (Cf. *Gibson v. Berryhill* (1973) 411 U.S. 564, 571 [93 S.Ct. 1689, 1694, 36 L.Ed.2d 488] [upholding a trial court finding that "a serious question of a personal financial stake in the matter in controversy was raised" where the board adjudicating charges of unprofessional conduct was composed of members who "would fall heir to" the business of those cited if the charges were sustained].)

Hyman was paid a standard hourly rate only for the matter she adjudicated. Unlike the circumstance in *Brown,* however, her primary employment is elsewhere, and from what we can glean from the record it does not appear she had any reasonable expectation of future employment with the county as a hearing officer. There is no conclusive evidence Green even discussed the

---

[1]At footnote 22, the majority suggests the county could devise a constitutionally acceptable selection process by precluding future appointment "until after a predetermined period of time long enough to eliminate any temptation to favor the county." (Maj. opn., *ante,* at p. 1037, fn. 22.) If even $10 or $15 remuneration is sufficient to compel disqualification, one must wonder how long a period would be necessary to eliminate such a "temptation."

possibility in hiring Hyman for plaintiff's hearing; until plaintiff raised the issue, she apparently had not considered the question. Thus, these hearings are not her "bread and butter" (*Brown v. Vance, supra,* 637 F.2d at p. 276); and she is not "dependent on [them] for subsistence." (*Id.* at p. 281.) Nor is there any evidence she would be "compelled to close [her] office" if the county declined to retain her services for future hearings. (*Id.* at p. 282.) It also appears from the record that such services would, in any event, be limited to license appeals on massage cases lasting only a few hours each. These cases arise with such infrequency that at oral argument county counsel indicated there had not been another such hearing in the eight years since this one. In other words, with respect to these particular matters and unlike the fee system decisions, the "volume of cases" to which the majority alludes (maj. opn., *ante,* at p. 1031) is nonexistent. In sum, Hyman could not therefore have had any realistic expectation of future retention. Under these circumstances, the possibility that the average person would be tempted to rule in favor of the county or be led "not to hold the balance nice, clear and true" between the parties (*Tumey v. Ohio, supra,* 273 U.S. at p. 532 [47 S.Ct. at p. 444]) is thus remote at best and contingent on factors unrelated to the selection process.

The demands of due process do not require either perfect ignorance or perfect altruism. Under these circumstances, I conclude that, even if "personal," any pecuniary interest on Hyman's part was not "direct" or "substantial" within the rationale of *Tumey v. Ohio, supra,* 273 U.S. at page 523 [47 S.Ct. at page 441], and its progeny. (See *Brown v. Vance, supra,* 637 F.2d at pp. 284-285.)