[1] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II.
[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 519 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 520 
OPINION
Marilyn Kaye Freeman challenges a judgment convicting her of solicitation to commit kidnapping, residential burglary, two counts of stalking, and misdemeanor child endangerment and battery. The offenses arose from Freeman's assaultive conduct towards her teenage daughter, and actions Freeman took against her daughter's foster parents.
 Freeman argues the judgment should be reversed because the superior court judge who presided over her trial had previously disqualified himself and was later reinstated into the case. We agree with Freeman's contention. In pretrial proceedings, the judge recused himself based on his friendship with a judicial colleague whom Freeman was rumored to be stalking. When the *Page 521 prosecution later notified the superior court that it had found no evidence to substantiate these stalking rumors, the supervising judge assigned the case to the disqualified judge for trial, essentially retracting the prior disqualification order. The disqualified judge accepted the assignment over Freeman's objection.
 Freeman did not file a petition for writ of mandate at the time of the reinstatement. Thus, she may not obtain appellate review of error under California's statutory disqualification scheme, but she is entitled to review for constitutional due process error. For reasons we shall explain in the published portion of this opinion, we conclude that fundamental due process error occurred when the judge, previously recused for bias, was reinstated into the case notwithstanding the repeated protests of defendant and under circumstances reflecting a persistent appearance of bias. The judge's reinstatement created a serious likelihood of undermining public confidence in an impartial judiciary, and created an error of constitutional dimension. Because the error affected the integrity of the judicial process, reversal is required.
 In the unpublished portion of this opinion, we reject Freeman's arguments that the trial court erred in denying her motions for acquittal and that she could not properly be charged with solicitation to commit kidnapping. Thus, there is no bar to retrial on the charged counts. We also deny Freeman's two petitions for writ of habeas corpus that raise issues related to those presented in her appeal.
 FACTUAL AND PROCEDURAL BACKGROUND In the published portion of this opinion addressing Freeman's challenge to the reinstatement of the disqualified judge, we need only briefly summarize the facts underlying the offenses. In accord with our standard of review on appeal, we present the facts in the manner most favorable to the judgment. (People v. Dayan (1995)34 Cal.App.4th 707, 709 [40 Cal.Rptr.2d 391].)
 On September 10, 2002, Freeman's 14-year-old daughter (E.) called the police reporting that her mother had assaulted her that day and had been doing so on a regular basis. E. was removed from her home and placed in a foster home. Freeman, an attorney, then engaged in an aggressive campaign to disrupt the foster placement and terrorize her daughter's foster parents in a misguided attempt to monitor and reunite with her daughter. Freeman solicited one of her clients to kidnap E. from the foster parents, burglarized the foster parents' home, chased the foster parents at high speeds on the freeway, followed them in her car on city streets, glared at them "in [an] evil manner" *Page 522 when she was spotted, spied on them at their residence and elsewhere, took pictures of them, and sprayed her perfume in their vehicle.
 The jury found Freeman guilty of solicitation to commit kidnapping, residential burglary, stalking, and misdemeanor child endangerment and battery. She was sentenced to prison for six years.
 DISCUSSION I. Challenge to Reinstatement of Disqualified Judge Freeman asserts Superior Court Judge Robert O'Neill, who had disqualified himself for bias during pretrial proceedings, was erroneously reinstated to preside over her trial.
 A. Background On December 19, 2002, after Freeman was arrested and taken into custody, Judge O'Neill presided over a readiness conference. Before the hearing commenced, defense counsel advised Judge O'Neill that Freeman wanted new appointed counsel and asked for a Marsden[2] hearing. After considering Freeman's and her counsel's input, the trial court granted the request for new counsel.
 At the conclusion of the Marsden
hearing, Freeman, who was still in custody, requested that Judge O'Neill conduct a bail review hearing. Freeman stated that she wanted to request house arrest because there were "rumors through the back hallways that [she] was stalking" another superior court judge, Judge Harry Elias. The stalking rumors apparently arose from matters observed on Freeman's computer that had been seized by the authorities in connection with the current case.
 Judge O'Neill stated that he had heard about the allegation, and explained that he had known Judge Elias for 23 years, they had worked together in the district attorney's office, and they were friends. Because of his relationship with Judge Elias, Judge O'Neill decided to "recus[e] [himself]" from the bail issue. Freeman informed Judge O'Neill that in another proceeding Judge Elias "made it very clear he [did not] think there [was] any substance to [the stalking rumors]." Notwithstanding this representation by Freeman, Judge O'Neill reiterated he was not "the person [who] should hear" Freeman's bail *Page 523 motion. Further, Judge O'Neill suggested that given the allegations concerning Judge Elias, Freeman might want to discuss with her counsel whether the bail issue should be considered by a judge who was not a member of the San Diego County Superior Court bench.
 At a rescheduled readiness conference on January 6, 2003, Freeman's new counsel advised Judge O'Neill that Supervising Criminal Judge Peter Deddeh had requested that all further dates be set in his department so that the case could be assigned to an "independent retired judge." Judge O'Neill complied and set the subsequent proceedings to be heard in Judge Deddeh's department.
 Between January and early September 2003, Judge Deddeh and several other San Diego judges presided over additional hearings related to appointment of counsel, bail review, discovery, and other matters. On September 3, 2003 — in an apparent effort to avoid potential conflicts with the local bench given the Judge Elias stalking rumors — Judge Deddeh assigned the case to retired Judge Charles Jones for all purposes. Judge Jones presided over the preliminary examination and bound Freeman over for trial. Between September 2003 and April 2004, Judge Jones presided over various pretrial matters. At a May 14, 2004 status conference, the district attorney advised Judge Jones that "the reason [for the assignment of the case to him] no longer exists." Accordingly, Judge Jones stated he would "transfer the matter back to [Judge Deddeh] . . . and let him decide" which judge should be assigned to the case.
 At a hearing on May 14, 2004, Judge Deddeh concluded there was no need for recusal of the San Diego County Superior Court bench, explaining: "[T]he only reason the bench was being recused [was] because there [was] a possibility that . . . on Miss Freeman's computer there was some indication that she was stalking Judge Elias. Apparently the computer has been reviewed. So out of an abundance of caution, [the prosecution] said Judge Elias may be a victim in this case. And so apparently he's not a victim in this case. And so there is apparently no reason for the bench to recuse itself." Judge Deddeh then assigned the case to Judge O'Neill for all purposes.
 At this point, Freeman objected (speaking directly to the court and not through her counsel), asserting that Judge O'Neill had already recused himself because he was "a good friend of Judge Elias." Judge Deddeh rejected the assertion, noting the Judge Elias matter had been resolved, but that Judge O'Neill could himself decide whether this was "an issue for him."
 On May 14, 2004, Freeman personally filed a handwritten challenge to Judge O'Neill. The pleading stated that Freeman was challenging Judge *Page 524 O'Neill "for cause," and cited the circumstances of Judge O'Neill's December 2002 recusal. Freeman's counsel did not join in the challenge.
 On May 20, 2004, Judge O'Neill and Judge Deddeh evaluated the motion in a series of hearings. Judge O'Neill's minute order reflecting actions at a 9:00 a.m. hearing states: "Peremptory challenge (declaration) filed. Per the court, file to be sent back to Dept. 11 for reassignment."[3] In department 11, Judge Deddeh ruled that the challenge could not be honored unless it was filed by defense counsel, and transferred the matter back to Judge O'Neill. At a 10:00 a.m. hearing before Judge O'Neill, Judge O'Neill initially analyzed the challenge as if it were a peremptory challenge under Code of Civil Procedure section 170.6, but Freeman's counsel interjected that the challenge was for cause (i.e., Code Civ. Proc., §§ 170.1). Freeman's counsel stated that Freeman was satisfied with Judge O'Neill and suggested she wanted to withdraw the challenge. However, Freeman herself posited that Judge O'Neill was not allowed to "rule on his own challenge." Judge O'Neill agreed and transferred the matter back to Judge Deddeh for a ruling. At a 2:00 p.m. hearing before Judge Deddeh, Freeman (personally and through counsel) withdrew the challenge, and the case was sent back to Judge O'Neill. The minutes for the 2:00 p.m. proceeding state "[t]he defendant withdraws her CCP170.6 challenge," whereas the reporter's transcript of the 2:00 p.m. proceeding reflects that Judge Deddeh characterized the motion as a "170.1 challenge."[4]
 From July through October 2004, Judge O'Neill ruled on various pretrial matters. On October 18, 2004, the date set for the commencement of trial, Freeman herself again raised the issue of Judge O'Neill's earlier recusal from her case in December 2002, and presented a typed motion to disqualify Judge O'Neill for cause under Code of Civil Procedure section 170.1. Freeman asserted that she believed Judge O'Neill was prejudiced because he told her so in December 2002, and that she was "bullied" by her attorneys to keep him as the judge because they told her she would be assigned someone "really terrible." Judge O'Neill responded that the issue had already been resolved by Judge Deddeh, and noted that Freeman's disqualification motion had been withdrawn and further that the motion must be brought by Freeman's attorney, not Freeman herself. Freeman did not file a petition for writ of mandate challenging the rejection of her disqualification motion. *Page 525 
 B. Governing Legal Principles California has enacted a comprehensive statutory scheme addressing the grounds and procedures for disqualification of a trial judge. A party seeking appellate review based on a violation under the disqualification statute must file a petition for writ of mandate within 10 days of notice of the disqualification decision. (Code Civ. Proc., §§ 170.3, subd. (d); People v. Brown (1993)6 Cal.4th 322, 333 [24 Cal.Rptr.2d 710, 862 P.2d 710] (Brown);People v. Carter (2005) 36 Cal.4th 1215, 1242, fn. 19 [32 Cal.Rptr.3d 838, 117 P.3d 544]; People v. Barrera
(1999) 70 Cal.App.4th 541, 550-551 [82 Cal.Rptr.2d 755].) The writ requirement is designed to promote judicial economy because "`"permitting [a disqualification] ruling to be attacked later on appeal of the judgment could invalidate every ruling made by the trial court judge after the disqualification motion was denied."'" (Brown, supra, 6 Cal.4th at p. 333, 
fn. 8.)
 Ordinarily, the failure to file a writ petition precludes a subsequent appellate challenge based on a disqualification claim. However, when the appellant's disqualification claim implicates constitutional due process rights, appellate review is permitted. InBrown, supra, 6 Cal.4th at pages 334-335, the California Supreme Court concluded that a party may raise a constitutional due process disqualification ground on appeal, even though the statutory disqualification ground addressing essentially the same due process issue may be reviewed only by writ. In Brown, the defendant had brought a writ petition challenging a disqualification decision on a statutory ground, and the petition was summarily denied. TheBrown court concluded the defendant's due process claim was entitled to the procedural protections afforded on appeal (i.e., oral argument and a written opinion) and thus he could again raise the issue in his appeal from the final judgment. (Id. at p. 336.) In dicta, the Brown court suggested that in some cases a negligent failure to file a writ petition may constitute a forfeiture of the constitutional claim. (Ibid.) However, subsequent to Brown, the high court clarified that as long as the disqualification claim was raised at trial, it could be raised on appeal on constitutional grounds even if a writ petition was not filed. (People v. Chatman (2006) 38 Cal.4th 344, 363
[42 Cal.Rptr.3d 621, 133 P.3d 534].) That is, "a defendant who raised the [disqualification] claim at trial may always `assert on appeal a claim of denial of the due process right to an impartial judge.'" (Ibid.)
 In this appeal, Freeman has raised numerous arguments challenging Judge O'Neill's participation in the trial. Because Freeman did not file a writ petition, our review is limited to determining whether Judge O'Neill's reinstatement into the case amounted to constitutional due process error. In particular, we evaluate Freeman's claims that her due process rights were *Page 526 violated because Judge O'Neill's initial decision to disqualify himself shows he was biased, and his reinstatement to preside over her trial was improper.
 Judicial bias may arise from actual bias or the appearance of bias. Actual bias exists if the judge has a mental predilection or prejudice regarding a particular party. (Inre Marriage of Lemen (1980) 113 Cal.App.3d 769, 789
[170 Cal.Rptr. 642].) An appearance of bias exists when a reasonable person aware of the facts of the case might harbor a doubt that the judge would be able to be impartial. (Brown, supra,6 Cal.4th at pp. 336-337; see United Farm Workers of Americav. Superior Court (1985) 170 Cal.App.3d 97, 103-104
[216 Cal.Rptr. 4].) Disqualification of a judge based on an appearance of bias is designed to protect the integrity of the legal system by promoting public confidence in an impartial judiciary. As pronounced by the California Supreme Court more than a century ago: "The trial of a case should not only be fair in fact, but it should also appear to be fair. And where the contrary appears, it shocks the judicial instinct to allow the judgment to stand." (Pratt v. Pratt (1903)141 Cal. 247, 252 [74 P. 742].) In Johnson v. Superior Court
(1958) 50 Cal.2d 693, 697 [329 P.2d 5], our high court again underscored the importance of the appearance of judicial neutrality, stating: "It is important, of course, not only that the integrity and fairness of the judiciary be maintained, but also that the business of the courts be conducted in such a manner as will avoid suspicion of unfairness." Similarly, a Court of Appeal noted: "[T]he source of judicial authority lies ultimately in the faith of the people that a fair hearing may be had. Judicial behavior inimical to that necessary perception can never be countenanced and may well provide a basis for reversal "(Catchpole v. Brannon (1995) 36 Cal.App.4th 237, 253
[42 Cal.Rptr.2d 440].)
 It is clear that the existence of actual bias violates constitutional due process and requires reversal. (SeeBracy v. Gramley (1997) 520 U.S. 899, 904-905
[138 L.Ed.2d 97, 117 S.Ct. 1793]; People v. Vasquez (2006)39 Cal.4th 47, 69, fn. 12 [45 Cal.Rptr.3d 372, 137 P.3d 199].) The constitutional import of the appearance of bias is less well defined. The United States Supreme Court has not clearly indicated whether, or under what circumstances, an appearance of judicial bias might rise to the level of a constitutional due process violation. (Compare Bracy v.Gramley, supra, 520 U.S. at pp. 904-905 [confining constitutional issue to actual judicial bias] with Taylor v.Hayes (1974) 418 U.S. 488, 501 [41 L.Ed.2d 897,94 S.Ct. 2697] In re Murchison (1955) 349 U.S. 133, 136
[99 L.Ed. 942, 75 S.Ct. 623] [referring to due process as involving both actual and appearance of bias]; see Welch v.Sirmons (10th Cir.2006) 451 F.3d 675, 700-701
(Welch) [discussing *Page 527 the unresolved issue]; People v. Chatman,supra, 38 Cal.4th at p. 363 [declining to decide the issue].)
 Several federal courts have considered the appearance of bias issue in the context of habeas corpus proceedings, and, relying on United States Supreme Court decisions, have concluded there is no clearly established federal constitutional right to disqualification of a judge based on the "mere appearance of bias." (Welch,supra, 451 F.3d at p. 701, italics added; Del Vecchiov. Illinois Dept. of Corrections (7th Cir.1994)31 F.3d 1363, 1371-1372, 1375 (Del Vecchio); Johnson v.Carroll (3d Cir.2004) 369 F.3d 253, 260-263.) However, these courts have recognized that when there is somethingmore than a "mere" appearance of judicial bias, constitutional due process rights may be implicated. InWelch, the court noted that the United States Supreme Court decisions referring to the appearance of bias in the constitutional context involved situations "in which the circumstances are sufficient to give rise to a presumptionor reasonable probability of bias." (Welch, supra, at p. 700, italics added.) Similarly, in Del Vecchio, the court concluded the high court's references to the appearance of bias did not refer to "bad appearances alone," but rather envisioned "circumstances that present `some [actual] incentive to find one way or the other' or 'a real possibility ofbias. . . .'" (Del Vecchio, supra,31 F.3d at p. 1372, original brackets, italics added.)
 California courts have also suggested there may be circumstances where the appearance of judicial bias has constitutional import. In Haas v. County of SanBernardino (2002) 27 Cal.4th 1017, 1033-1034
[119 Cal.Rptr.2d 341, 45 P.3d 280], the California Supreme Court reasoned that a hearing officer's financial interest in the case created an objective "appearance of bias that has constitutional significance" because the financial conflict might tempt the average adjudicator. In several cases the Courts of Appeal have equated the appearance of bias with fundamental error requiring reversal when the record was replete with inappropriate statements by the judge such that "the average person could well entertain doubt whether the trial judge was impartial." (Catchpole v. Brannon, supra, 36 Cal.App.4th at p. 247; see Hernandez v. Paicius (2003) 109 Cal.App.4th 452,455, 461-463 [134 Cal.Rptr.2d 756]; Hall v. Harker
(1999) 69 Cal.App.4th 836, 841-843 [82 Cal.Rptr.2d 44], overruled on other grounds in Casa Herrera, Inc. v.Beydoun (2004) 32 Cal.4th 336, 346 [9 Cal.Rptr.3d 97,83 P.3d 497].) Recently, the California Supreme Court concluded that an erroneous denial of a motion to recuse aprosecutor for the appearance of bias did not, under the particular *Page 528 circumstances of the case, rise to the level of constitutional error. (People v. Vasquez, supra,39 Cal.4th at pp. 64-65.) However, in reaching this conclusion the court contrasted the standards governing prosecutorial bias with those governing judicial bias, and referred to the deeply rooted tradition of maintaining "`rigidrequirements' of adjudicative neutrality. . . ." (Id. at p. 64, italics added.)[5]
 These federal and California decisions reflect that there may be situations where the appearance of judicial bias is sufficiently elevated so as to invoke constitutional due process rights. Thus, judicial bias may implicate constitutional due process not only when it is based on actual bias, but also when it involves an appearance of bias that could undermine the public's confidence in a fair judiciary.
 C. Analysis At the December 2002 hearing, Judge O'Neill recused himself based on his awareness of rumors that Freeman had been stalking Judge Elias, with whom Judge O'Neill had a longtime friendship. Judge O'Neill insisted on disqualifying himself, telling Freeman he was not "the person [who] should hear" the bail motion, even when Freeman attempted to convince him the Judge Elias stalking rumors were not true. Although it is unclear from this comment whether Judge O'Neill reached this conclusion because he believed he personally could not be fair or because he recognized that these circumstances created an appearance of bias, the critical point for our analysis is that Judge O'Neill believed his participation in the case was improper and disqualification was absolutely necessary.
 The issue before us is whether, based on the subsequent events, Judge O'Neill could be reinstated into the case without violating due process principles. These events consisted of the prosecution notifying the supervising judge that Freeman's computer files had been reviewed and there was no *Page 529 evidence that Judge Elias was a victim of Freeman's stalking activities. Judge O'Neill found this information eliminated the problem of actual bias and/or the appearance of bias. Although we can accept the validity of Judge O'Neill's belief that he could be fair and impartial and that he did not have any actual bias towards Freeman, we conclude theappearance of bias persisted despite these beliefs.
 The prosecution's conclusion there was no supporting evidence on Freeman's computer does not definitively establish that the stalking did not occur, and a reasonable observer might question whether Judge O'Neill was still affected by the reports of stalking conduct directed at his friend. The record shows Judge O'Neill initially believed he could not properly preside over the trial because of his awareness of the stalking rumors. The fact the prosecution did not find supporting evidence and decided not to pursue formal charges does not necessarily show the rumors were false or had dissipated. Thus, this was not a situation where the disqualifying factor was based on an objectively verifiable fact that was later determined to be untrue.[6] Additionally, the stalking rumors were closely related to the criminal charges actually filed against Freeman, enhancing the perception that the prior rumors could continue to influence the trial judge's ability to be impartial. Viewing the totality of the circumstances, a reasonable person might still harbor doubts as to whether Judge O'Neill was unaffected by the rumors.
 Once a judge has been disqualified for actual bias or the appearance of bias, the public has a right to expect that the judge will have no further dealings with the case except for minor, ministerial-type matters. This expectation is not only intuitively sound, it is consistent with California's statutory disqualification scheme which generally prohibits a disqualified judge from any further involvement in the case and provides no mechanism for a disqualified judge to be reinstated into the case. (Code Civ. Proc.,[7] §§ 170.3, subds. (a)(1), (b)(1), 170.4.)[8] Section 170.4 delineates the duties a disqualified judge may still perform, and provides that except for these limited duties, "a disqualified judge shall haveno power to act in any *Page 530 proceeding after his or herdisqualification or after the filing of a statement of disqualification until the question of his or her disqualification has been determined." (§§ 170.4, subd. (d), italics added.)[9] "Proceeding" is defined as "theaction, case, cause, motion, or special proceeding to be tried or heard by the judge." (§§ 170.5, subd. (f), italics added.) Thus, under the statutory scheme a disqualified judge may not "pick and choose" the matters from which he or she is recused. Once disqualified, the judge is precluded from acting in the case except on limited and clearly defined matters. (See Geldermann, Inc. v. Bruner (1991)229 Cal.App.3d 662, 665 [280 Cal.Rptr. 264]; Christie v. City ofEl Centro (2006) 135 Cal.App.4th 767, 777-780
[37 Cal.Rptr.3d 718].) Further, there is no statutory provision authorizing a disqualified judge to be reinstated to preside over the trial when the judge was disqualified during earlier proceedings.
 Additionally, although the disqualification statute allows the parties to waive some statutory grounds for disqualification, "personal bias or prejudice concerning a party" may never be waived. (§§ 170.3, subd. (b)(2)(A).) This reflects the fundamental nature of the right and necessity for adjudication by an unbiased trial judge. Moreover, even as to matters that may be waived, the waivers are subject to strict statutory requirements and are not effective unless the parties and their attorneys agree in writing to the judge's participation and the writing is included in the record. (§§ 170.3, subd. (b)(1).) Even if we were to apply the disqualification waiver standard to permit reinstatement of a recused judge, this record is devoid of a proper waiver. Apparently recognizing this, the Attorney General does not contend that Freeman's withdrawal of her disqualification motion can be construed as a proper waiver of her right to challenge Judge O'Neill's reinstatement based on his earlier recusal for personal bias.
 The fact that Judge O'Neill had previously recused himself for bias invokes issues of fundamental fairness once he was reinstated into the case, regardless whether the prior recusal was based on an appearance of, or actual, bias. Even if Judge O'Neill subjectively viewed his recusal as based on an appearance of bias, the circumstances giving rise to the recusal — including the longstanding friendship, the serious nature of the suspected activity directed at his friend, and the similarity of the conduct underlying the pending charges and the Judge Elias stalking rumors — are consistent with *Page 531 what one would typically associate with actual bias. Under these circumstances, involving a protesting defendant and a likely public perception of actual bias, the reinstatement of the disqualified judge created a serious likelihood of undermining public confidence in an unbiased judiciary. This strikes at the heart of the integrity of our judicial system and creates far more than a "mere" appearance of bias, thus implicating constitutional due process concerns.
 We conclude that Judge O'Neill's December 2002 recusal ruling barred him from presiding over Freeman's trial. Further, under the particular circumstances presented here, we conclude his erroneous reinstatement rises to the level of a constitutional violation requiring reversal. Maintaining public confidence in an impartial judiciary is a core value of our judicial system and is necessary to preserve the integrity of the judicial process. This value was denigrated when the judge, previously disqualified on bias grounds, presided over the trial notwithstanding the repeated protests of defendant and circumstances reflecting a persistent appearance of bias. The reinstatement of the disqualified judge in this case sufficiently impacts the public perception of judicial neutrality so as to constitute structural error requiring reversal. (See Catchpole v. Brannon, supra,36 Cal.App.4th at p. 247; Hernandez v. Paicius, supra,109 Cal.App.4th at pp. 462-463.)
 D. Freeman's Petition for Writ of Habeas Corpus Alleging Appellate Counsel's Ineffective Representation on the Issue of Judicial Bias After the appellate briefing in this case was completed, Freeman filed an in propria persona petition for writ of habeas corpus alleging that appellate counsel incompetently argued the judicial bias issue on appeal. Freeman asserts her appellate counsel was ineffective because he failed to raise the issue that the entire San Diego County Superior Court bench had been recused. Given our reversal of the judgment, we need not consider this issue, and accordingly deny the writ. We do note, however, that our holding extends only to Judge O'Neill. The qualifications of any other San Diego Superior Court judge to preside over any retrial is not before us in this appeal.
 II. Issues Pertinent to Potential Retrial Given our reversal, we need not address Freeman's arguments regarding instructional error and the erroneous admission of evidence. However, several of her arguments raise issues that impact the district attorney's right to retry her case. Accordingly, we address Freeman's contentions that (1) the trial court erred in denying her motion for acquittal of the various charged offenses, and (2) she could not be properly charged with solicitation to commit kidnapping. We conclude there was substantial evidence to support a finding of guilt on the charged offenses, and that the solicitation to commit kidnapping charge was proper. Accordingly, there is no bar to retrial on the charged counts. (See In re Cruz (2003)104 Cal.App.4th 1339, 1344-1345.)
 A. Facts Protective Custody
 On the afternoon of September 10, 2002, Freeman's daughter, E., age 14, called 911. She reported Freeman had hit her and thrown her against walls, such incidents had been happening all her life, and recently the frequency of the incidents had been increasing. E. explained that her mother home-schooled her and would lock her in the trailer where they resided. E. stated that about one hour earlier, her mother "grabbed [E.'s] head, . . . beat [it] against the wall and . . . hit . . . and yelled at [E.] . . ." E. was crying and afraid that when her mother returned home, "it [was going] to be even worse." E. told the dispatcher she had called her aunt and her aunt advised her to call 911.
 About 50 minutes after the 911 call, Deputy Sheriff Margaret Barone spoke to E. on the phone. E. sounded very upset and frightened. About 15 minutes later, Deputy Barone arrived at E.'s residence. E. appeared terrified; her voice was cracking and her hands were shaking. Deputy Barone observed large welts on E.'s thigh and calf, bruising on her hip, and minor scratches on her arm. E. complained of pain to her forehead and shoulder.
 E. told Deputy Barone that when she was sleeping on the couch that day, Freeman screamed and yelled at her to get up. Freeman kneed E. and started hitting and kicking her. During the struggle Freeman pushed E. and E.'s forehead hit the wall. When E. landed on the floor, her mother continued to kick her. E. managed to shove her mother off her; E. then ran out of the trailer and hid behind some bins. E. heard Freeman drive away, and then quickly drive back. Freeman yelled at E. to come out, but E. was too afraid. E. peeked around a corner of the bins and was terrified of the look on her mother's face.
 E. told Deputy Barone that she first recalled being hit by her mother when she was three years old and she remembered the police being summoned about seven years ago. She stated the abuse had become progressively worse during the past year and had been almost a daily occurrence during the past six months. E. was concerned about what was going to happen when her mother returned home. Based on E.'s injuries, the potential for violence when Freeman returned, and E.'s level of fear, Deputy Barone took E. into protective custody. Deputy Barone expedited their departure without gathering any of E.'s belongings, because E. was fearful and in a rush to leave. As they drove away E. crouched down on the floor of the police vehicle, stating she did not want her mother to see her.
 E. was taken to Green Oaks Ranch, a temporary placement facility. Nurse practitioner Lorrie York observed bruises on E.'s hip, thigh, and calf, and scratches on her back, arm and leg.
 Foster Home Placement
 On September 17, 2002, Child Protective Services (CPS) placed E. in the home of foster parents Vanessa Franco and Diana Gonzalez. Typically, a parent who is permitted unsupervised visitation is given the foster parents' phone number to arrange visitation. However, because of the protective issues, E.'s placement was confidential and Freeman was not given the foster parents' phone number. Franco was told that Freeman could have contact only with the social worker, and the social worker would convey any necessary information about E. to Franco.
 When Franco met E., E. was very fearful and intimidated by everything around her. As Franco and E. were driving to eat lunch on the day of their first meeting, E. sank very low in her seat, almost to the floorboards, so that her head could not be seen above the window. Franco tried to reassure E. that her mother was not following her. While living in Franco's home, Franco described E. as suffering from "a beaten dog syndrome" and noted she would jump if she heard a loud noise and would flinch if spoken to in a high tone of voice. E. told Gonzalez and Franco that her mother had physically assaulted and tormented her for years, including kicking her, chasing her with a knife, pushing her into a brick wall, putting feces on her hairbrush, and threatening to kill her and make it look like suicide. E. stated her mother had also threatened other people with guns. Solicitation to CommitKidnapping
 On September 3, 2002, Kimberly Oakley, who was contemplating divorce, hired Freeman, who is an attorney, to represent her. When Oakley next spoke with Freeman on September 15, 2002, Freeman seemed different. Contrary to her behavior at their first meeting, Freeman now rambled and failed to respond to Oakley's divorce-related questions. Freeman told Oakley that her daughter had been unjustly removed by CPS, and that she was desperately trying to locate E.'s foster home. Freeman explained that she was concerned for her daughter because of her daughter's undiagnosed schizophrenia. Oakley, who had a daughter with a drug addiction problem in a residential treatment program, was sympathetic. Thereafter, Freeman frequently called Oakley to "unload" about the situation, and Oakley offered to help Freeman.
 During one of these conversations in September 2002, Freeman told Oakley that E. and her foster family were attending Calvary Chapel in Escondido, which was the same church Oakley attended. Accordingly to Oakley, Freeman repeatedly pressed her to speak to the Calvary Chapel youth pastor to find out information about E.
 In early October 2002, Freeman told Oakley that she had "a couple of plans" to "steal" E. from the foster family and stated she always carried large sums of cash with her so she could take E. across the Canadian or Mexican border. Freeman told Oakley that one option she had contemplated was the use of an "escort" from a residential drug treatment program to take E. Oakley explained to Freeman that this service, which was used to remove combative, uncooperative teens from their homes, could not be used to take E. from the foster family, but Freeman did not appear to understand this.
 Freeman also repeatedly asked Oakley to "steal" E. from the foster family, stating she had a couple of ideas how to accomplish this. Freeman suggested a plan where Freeman would wait in the car and Oakley would try to lure E. out of the foster home by telling E. how much Freeman loved her. Freeman was sure E. would come over and see Freeman in the car, and then Freeman could "`take off'" with her. Freeman also proposed that Oakley go to E.'s YMCA after-school program while Freeman waited in the car. Freeman opined that when Oakley told E. how much her mother loved and missed her, E. would agree to walk over to Freeman's car; then Freeman "`would take [E.] and get her in the car and take off for the Canadian border or the Mexican border.'" Oakley refused Freeman's requests to carry out these plans. When Oakley refused, Freeman was angry with Oakley and told her she had another friend who she would ask to take E.
 In late October, notwithstanding Oakley's previous refusals, Freeman continued to press Oakley to help her get E. Freeman told Oakley she "`really need[ed]'" Oakley's help and pointed out that it would be easy for Oakley to hide E. at Oakley's rural, gated home. Oakley continued to refuse her requests, telling Freeman her idea to take E. was "absolutely ludicrous."
 October 11 Residential Burglary
 Around 2:00 or 3:00 p.m. on October 11, 2002, Freeman called Oakley and told her she had broken into the office of the high school E. was attending and located E.'s foster home address on the school's computer system. Freeman related that she had been spying on the foster family for "quite some time" and she was upset about the way they were handling E. Freeman told Oakley she would rent various cars and disguise herself in different outfits; she watched the foster family from the parking lot in their apartment complex; and she followed them when they went places.
 At about 8:30 p.m. on October 11, 2002, Freeman again called Oakley. Freeman was hysterical because E. had not returned to the foster parents' home. Freeman explained that she was concerned for her daughter's safety because she had been watching the apartment for a good part of the day; E. had not returned home at her typical time; and E. still had not returned home. Freeman begged Oakley to go with her to watch the apartment. Freeman stated E. needed medication; no one had diagnosed E. with schizophrenia; no one could handle E. correctly; and E.'s life was being jeopardized. Oakley felt sorry for Freeman and agreed to accompany her.
 Around 9:30 p.m., Freeman picked up Oakley at Oakley's residence. Freeman drove at a dangerously fast speed to the complex; she was hysterical and screeching that her daughter was in danger and she had to get her daughter away from the foster parents. Freeman told Oakley that she had spent several nights and days in the parking lot watching her daughter and the foster parents, and that she had tried that day to break into the foster parents' apartment.
 Freeman and Oakley watched the apartment for about two hours, and it did not appear that anyone was at home. Oakley told Freeman it was time to leave, and tried to reassure Freeman that her daughter was all right. Freeman insisted she needed to "`find out what's going on here'" and she had to see if E. was "`okay.'" Freeman left the vehicle and went to a minimart where she bought a flashlight and batteries. After Freeman returned to the car and Oakley again tried to persuade her that they should leave and her daughter was fine, Freeman got out of the car and said, "`I don't care. Why should I take this anymore?'" Freeman got the flashlight and a camera and told Oakley she was going inside the foster parents' apartment.
 Oakley followed Freeman and tried to dissuade her from entering the apartment. Oakley saw Freeman go over a back wall and enter the apartment through a sliding glass door that had apparently been left open. Oakley saw the camera's flash go off several times and heard drawers being opened and closed. Freeman was in the apartment for about seven or eight minutes. When she returned, Freeman was in a manic-type state. She appeared elated that she had taken pictures; told Oakley that the foster mothers slept together; and stated she had found an address book although she did not have the book with her. Freeman appeared content that she had obtained what she had thought she would get in the apartment, and they left.
 On October 12, 2002, Gonzalez noticed that their front door lock had been tampered with, but she did not notice any other disturbance at their apartment. About one month later, Franco and Gonzalez were informed that Freeman may have broken into their apartment.
 October 19 Incident
 Franco and Gonzalez first became aware that someone was following them on October 19, 2002. On this occasion, Franco and Gonzalez drove with E. and their other foster daughter to Los Angeles to visit Franco's grandmother. They first stopped at Franco's mother's home in Oceanside, and then started their trip north at about 9:30 or 10:00 p.m. As Franco was driving on the freeway to her grandmother's house, she noticed a vehicle that seemed to have been following too closely behind her for some time. Franco changed her driving to see if the vehicle would pass them (i.e., slowing down, changing lanes), but the vehicle stayed behind them no matter what she did. Franco tried to lose the vehicle by accelerating to about 75 or 80 miles per hour and changing lanes, but the vehicle continued to follow them. The driver of the vehicle that was following them made several dangerous maneuvers to keep up with Franco, including cutting off vehicles in other lanes and driving within inches of Franco's back bumper. At one point Franco accelerated to 95 miles per hour in her unsuccessful attempts to evade the vehicle.
 After the vehicle had been following them for about one-half hour and Franco saw that traffic up ahead was congested, Franco decided to exit the freeway to try to lose the vehicle. The vehicle followed her off the freeway, and at one point its headlights were turned off while it continued to follow them. Franco drove about 40 miles per hour on the surface streets trying to get away from the vehicle, and accidentally ended up on a dark, dead-end residential street with the vehicle still behind her. As Franco turned around in a driveway, the other vehicle stopped across the street with its headlights still turned off. Franco drove back to the freeway at a speed of about 45 to 50 miles per hour, with the vehicle still following her. Once on the freeway, the driver of the pursuing vehicle continued to drive with the lights off. Franco finally managed to lose the vehicle by quickly cutting across traffic lanes and exiting on a left-side off-ramp.
 During the incident, Franco was in a "complete panic" and her heart was pounding "a hundred miles a minute." Gonzalez was "[f]rightened to death." The two children were screaming hysterically in the back seat. Because of the speeds she was driving while trying to evade the car, Franco feared for the safety of the occupants of her car and other cars, but explained she was in "survival mode" and could think only of "get[ting] away."
 Franco estimated that the entire incident lasted for about one hour. Gonzalez observed that the vehicle following them was a dark grayish-blue Ford Windstar minivan. At one point when the van was beside Franco's car, Gonzalez saw that the driver was light-skinned, heavyset, and appeared to be wearing a disguise, including a wig, dark glasses, and a mustache. During the incident, E. stated the driver was probably her mother who was "trying to get her."
 Freeman admitted to Oakley that she had followed the foster parents on a Los Angeles freeway. Freeman told Oakley she had rented a car, dressed up in alternate clothing hoping the foster family would not recognize her, followed the family to a residence in Oceanside, and then chased them into a Los Angeles area. Freeman was "really proud" that she had chased them, and told Oakley she was glad that she "really shook them up" and "really scared them." Freeman stated she stared at them and gave one of the foster mothers a dirty look when she was driving beside her.
 October 23 Incident
 On October 23, 2002, another incident occurred. Around 10:15 p.m., while Gonzalez was driving with E. from Franco's mother's residence to their home, Gonzalez noticed that a gold Ford Explorer was following them. The vehicle continued to follow Gonzalez as she tried to evade it. Rather than going home, Gonzalez turned on a street, pulled over, and waited 10 minutes. She did not see the Ford Explorer, so she drove to their apartment. As they were walking towards their apartment, E. saw the gold Ford Explorer coming into the parking entrance of the complex. Gonzalez did not think it was safe to go to their apartment, so she and E. returned to their car. The Ford Explorer then turned around to leave the complex. Gonzalez, wanting to know who was following them, followed the Ford Explorer and had E. write down the license plate number, and the estimated year, make, and model of the vehicle. Gonzalez drove up next to the Ford Explorer when traffic slowed because of an accident. The driver tried to cover her face, but E. began crying and screaming, "That's my mother. How could she do this to me?" E. put her seat back so that she could not see Freeman. Gonzalez looked over at Freeman, and Freeman looked at Gonzalez "in this evil manner" as if she wanted to hurt Gonzalez.
 Gonzalez did not return home, but drove to Franco's mother's house. When they arrived at Franco's mother's home, Gonzalez was hyperventilating and crying and E. was crying hysterically. At this point, Franco and Gonzalez called the police and CPS. Because of the incident, the next day Gonzalez stayed home from work and E. did not go to school, and E. had an emergency session with her therapist. Franco and Gonzalez changed the locks on their door, put extra locks on the sliding doors and windows, and got a private mail box. November 3Incident
 On November 3, 2002, between 6:00 and 7:00 p.m., Gonzalez noticed a white Ford Windstar van with tinted windows parked directly across from their apartment. Gonzalez told E. to stay in the apartment. Gonzalez grabbed her phone and stepped outside to see if anyone was in the van. She saw a head moving in the back of the van, but she could not see enough to identify the person. When she returned to her apartment, the van sped off. In spite of the extra security measures at her apartment, Gonzalez still felt frightened.
 In early November 2002, during one of Oakley's meetings with Freeman, Oakley saw that Freeman was driving a white minivan. Freeman told Oakley that she had rented the minivan and that it was one of the cars she had been using to spy on the foster family.
 Perfume Incidents
 On one occasion, Freeman sent E. a filthy jacket that smelled like Tea Rose perfume. On another occasion, after Gonzalez left her car unlocked while picking E. up from school, the car smelled like Tea Rose perfume. E. told Gonzalez that the perfume smelled like her mother's perfume. Gonzalez felt scared, thinking that Freeman would "go to any extent to do something to [Gonzalez]." Freeman told Oakley that she had doused the jacket and sprayed the foster parents' car with her perfume because she wanted her daughter to smell her presence.
 Oakley's Reporting of Freeman to CPS onNovember 10
 On November 8, 2002, Freeman called Oakley. Freeman was crying and hysterical and threatening to kill herself. Freeman told Oakley that she had a lot of work to do in E.'s dependency case and that to win her case she had to prove E. was incompetent. Freeman asked Oakley to go with her to the law library to help her sift through the information. Oakley agreed to help Freeman in exchange for a reduction in Freeman's fees.
 On November 9, 2002, Oakley accompanied Freeman to the law library. During this meeting, Freeman's mood shifted at different times from elated and happy to sullen and angry. Freeman "threw a ton of papers" from E.'s dependency case in front of Oakley and told her to read them. As Oakley started reading the papers depicting the reasons E. had been removed from Freeman's custody, Oakley realized that Freeman was "a complete con artist, that nothing she had ever told [Oakley] was ever true about her daughter." When Oakley questioned Freeman about the allegations in the dependency reports, Freeman acknowledged that she "vaguely remembered" hitting E. on the hips and slamming E. into a wall; that she was holding a knife during one of the reported incidents; and that she pretended to wipe a piece of toilet paper with feces on it on E.'s hair brush. When Oakley suggested that Freeman admit to some of the allegations and get counseling, Freeman became angry, stating that she could lose her law license and that she had to prove E. was incompetent.
 On November 10, 2002, Oakley called CPS to advise E.'s social worker that she was concerned for E.'s safety. On November 14, 2002, E. was removed from Franco and Gonzalez's foster home.
 On December 6, 2002, the police searched Freeman's residence and car. The police developed rolls of film found in Freeman's residence, and showed the photographs to Gonzalez and Franco. The photographs depict Gonzalez, the open front door of Franco's and Gonzalez's residence, their other foster daughter, Franco's place of employment and car, and Franco's mother's residence and car.
 Foster Parents' Reactions to theStalking
 Because of the stalking incidents, Gonzalez and Franco felt their life was completely changed. They felt fearful and constantly on guard. Gonzalez had trouble sleeping and had nightmares. Franco felt vulnerable, helpless, and "completely violated." She was also concerned for the safety of her mother and other family members. During the time when they did not know who was following them, Franco was frightened because she had no idea what the person's intentions were. Once the stalker was identified as Freeman, Franco was frightened because she did not know what Freeman was capable of, particularly given E.'s accounts of her mother's previous violent behavior.
 The jury convicted Freeman of two counts of stalking (one count per foster parent); residential burglary; solicitation to commit kidnapping; and misdemeanor child endangerment and battery of E. She received a six-year sentence.
 B. Motion for Acquittal ofStalking
 Freeman argues the trial court erred at the close of the prosecution's case-in-chief in denying her Penal Code[10] section 1118.1 motion for acquittal of the two stalking counts (one involving Franco and the other involving Gonzalez).
 A trial court's evaluation of a motion for acquittal is governed by the same substantial evidence test used in an appellate challenge to the sufficiency of the evidence, i.e., the trial court determines "whether from the evidence then in the record, including reasonable inferences to be drawn therefrom, there is substantial evidence of every element of the offense charged." (People v. Coffman and Marlow (2004)34 Cal.4th 1, 89.) If the record can reasonably support a finding of guilt, a motion for acquittal must be denied even if the record might also justify a contrary finding. (SeePeople v. Holt (1997) 15 Cal.4th 619, 668.)
 At the time Freeman engaged in the alleged offenses, the crime of stalking was defined as committed by "[a]ny person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family. . . ." (Former §§ 646.9, subd. (a).)[11] The elements of the stalking offense were (1) repeatedly following or harassing another person, (2) making a credible threat, (3) intent to place the person in reasonable fear for the safety of the person or his or her family, and (4) causing actual fear. (SeePeople v. Norman (1999) 75 Cal.App.4th 1234, 1239;People v. Carron (1995) 37 Cal.App.4th 1230, 1238-1239.)
 Section 646.9, subdivision (e) defined harassment as "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person." Course of conduct was defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of `course of conduct.'" (§§ 646.9, subd. (f).) A credible threat was defined as a verbal or written threat, or a threat "implied by a pattern of conduct" made with the intent to place the victim in reasonable fear for his or her safety or the safety of his or her family and made with the apparent ability to carry out the threat so as to cause such fear. (§§ 646.9, subd. (g).) The fear suffered by the victim need not be experienced simultaneously with the commission of the act designed to generate the fear; thus, stalking is committed even when the victim learns of the defendant's conduct some time after its occurrence. (People v. Norman, supra,75 Cal.App.4th at pp. 1239-1241.)
 Freeman argues: (1) her conduct of following E.'s foster parents served the legitimate purpose of furthering her fundamental right to parent; (2) there was no evidence she issued a credible threat with the intent to cause fear; and (3) there was no evidence that a reasonable person would have suffered substantial emotional distress or that the foster parents actually suffered such distress. 1. FundamentalRight to Parent
 We agree that a parent has a fundamental right to parent, and also agree that if the record had shown as a matter of law that Freeman's conduct reflected a legitimate exercise of this right, the jury's verdict could not stand. However, Freeman's contention is belied by a record that provides ample evidence from which the jury could conclude that Freeman's conduct was inconsistent with efforts to assert parental rights or to merely monitor the well-being of her child while in foster care. Evidence was presented showing that Freeman engaged in conduct that did nothing to inform her about her daughter's well-being and that in some instances seriously threatened her daughter's safety. This included making plans to "steal" her daughter, breaching the confidentiality of the foster placement, breaking into the foster parents' home when her daughter was not there, pursuing the foster parents and her daughter at dangerously high speeds on a Los Angeles freeway, turning off her vehicle lights while following them at night, following Gonzalez and her daughter on the San Diego streets and glaring at Gonzalez, spying on the foster parents at their residence and other places, and spraying Gonzalez's car with her perfume. When viewed in its totality, a jury could reasonably conclude Freeman's actions were unrelated to E.'s well-being, and did not serve the legitimate purpose of advancing Freeman's fundamental right to parent.
 To support her argument that she should have been acquitted of the stalking charges based on the fundamental right to parent, Freeman asserts that no evidence was introduced showing that she was precluded by court order from contacting her daughter during the time period of her alleged criminal behavior. Regardless of whether a formal no-contact order had been entered, such an order was not dispositive on the issue of stalking. Even if Freeman was permitted contact with her daughter, a jury could reasonably conclude that the means Freeman chose to monitor her daughter's foster placement exceeded the legitimate exercise of parental rights.
 2. Credible Threat with Intent to CauseFear
 Freeman argues that the evidence did not show a credible threat with intent to cause fear because she consistently tried to hide her identity and she was motivated by a concern for her daughter and a desire for reunification with her. Because intent is inherently difficult to prove by direct evidence, the trier of fact can properly infer intent from the defendant's conduct and all the surrounding circumstances. (People v. Edwards (1992) 8 Cal.App.4th 1092, 1099.)
 Regardless of Freeman's attempts to hide her identity and her expressed concerns for her daughter, the evidence shows she acted in a manner inconsistent with an intention to merely check on her daughter's welfare without frightening the foster parents. On October 19 Freeman engaged in a lengthy, dangerous pursuit on a Los Angeles freeway. Freeman told Oakley that she was "really proud" she had chased them on a Los Angeles freeway and glad she had "really scared" them during the ordeal. A few days later, on October 23, she again followed one of the foster parents in her vehicle and glared at the foster parent "in [an] evil manner." On November 3 Freeman stationed herself in a van by the foster parents' apartment and sped off after she was spotted by one of the foster parents. The foster parents ascertained that Freeman had sprayed perfume in their car. The foster parents were aware that Freeman had been resourceful enough to find their address even though the foster placement was confidential, and they were informed she had likely broken into their apartment.
 Freeman's brazen burglary into the school to retrieve the foster parents' address from the computer, followed by her late night burglary into their residence, her reckless pursuit of them on a Los Angeles freeway, her glaring at Gonzalez when her identity was discovered, and her entry into Gonzalez's car to spray perfume, do not reflect surveillance conduct carried out with no intent to cause fear or no ability to carry out a threat. Further, the jury could reasonably consider that stalking by an unidentified person wearing a disguise can be even more ominous than stalking by an identified person, and that the foster parents were in the frightening position of being unable to stop the surveillance as long as they could not provide a positive identification. The fact that Freeman may have believed she was acting out of concern for her daughter and as a means to reunify did not mean that the jury could not conclude she chose to advance her goals by intentionally terrifying the foster parents. Viewing the circumstances in their totality, the jury could reasonably conclude that Freeman intentionally imbued her conduct with a sinister tone, and that she engaged in conduct that would inevitably convey to the foster parents her ability and desire to go to great lengths to spy on them and frighten them. The evidence supports a finding that Freeman intended to, and did, communicate a credible threat with the intent to cause fear.
 Freeman posits that to the extent her course of conduct showed she committed the "follow[ing] or harass[ing]" element of stalking, that same conduct cannot be used to establish the "credible threat" element of stalking. The argument is unavailing. The fact that the same conduct may overlap to establish more than one element of an offense does not defeat the sufficiency of the evidence to support each element. We are not persuaded by Freeman's suggestion that the Legislature intended to require distinct conduct to show harassment and a credible threat because it defined harassment as a "course of conduct" whereas it defined an implied credible threat as arising from a "pattern of conduct." (§§ 646.9, subds. (e), (g), italics added.) When read in its entirety, it is clear that the different definitional subdivisions of section 646.9 merely elaborate on the required elements, which in essence require a harassing course of conduct accompanied by a credible threat, the latter which may be implied by a pattern of conduct. Indeed, in subdivision (f) of section 646.9, the Legislature defined "course of conduct" for harassment as meaning a "pattern of conduct," thus using the two terms interchangeably. (Italics added.)
 To support her assertion that there was no evidence she intended to place the foster parents in fear for their safety, Freeman notes that notwithstanding repeated opportunities to do so, she never issued an express verbal or written threat to them. The argument fails because the statute does not require an express threat; an implied threat from a pattern of conduct suffices.
 3. Substantial Emotional Distress Caused byHarassment
 There was also sufficient evidence for the jury to find that a reasonable person would have suffered substantial emotional distress from Freeman's stalking, and that the foster parents did in fact suffer substantial emotional distress. Substantial emotional distress within the meaning of the stalking statute means "something more than everyday mental distress or upset. . . . [T]he phrase . . . entails a serious invasion of the victim's mental tranquility." (People v.Ewing (1999) 76 Cal.App.4th 199, 210.) The foster parents first became aware they were being followed on October 19; they again knew they were being followed on October 23 and discovered Freeman's identity; and on November 3 they knew someone was watching their apartment. They described their extreme fear during a Los Angeles freeway pursuit, and their ever-increasing fear and distress as the stalking continued and they discovered their pursuer was E.'s mother. They knew that Freeman had succeeded in breaking through the confidentiality of the foster placement, and discovered she had likely entered their vehicle to spray perfume and broken into their apartment. Franco testified she did not know what Freeman was capable of, particularly given her past behavior towards her daughter. Contrary to Freeman's assertion, the fact that Franco and Gonzalez chose to be foster parents and to thereby take the risk of exposure to confrontations with disgruntled birth parents did not require the jury to find a foster parent would not reasonably experience substantial distress when subjected to the prolonged type of conduct that occurred here. The record contains a full description of the foster parents' fearful reaction to Freeman's conduct and its lingering deleterious effects on their well-being, including nightmares, loss of sleep, and a sense of helplessness and vulnerability. This evidence was sufficient to support a finding that a reasonable person would have suffered substantial emotional distress, and that the foster parents experienced this type of distress.
 Freeman further maintains that it was E.'s unverified descriptions of her mother's previous assaultive behavior that caused the foster parents' fear, rather than the conduct committed by Freeman towards the foster parents. The jury was not required to reach this conclusion. As stated, Freeman engaged in stalking conduct that started with a reckless vehicular chase on the freeway, more vehicular following, glaring, spying at their residence, and spraying of perfume in their car. Later, the foster parents discovered she had taken pictures of them and even broken into their apartment. Although E.'s descriptions of her mother's behavior may have served to heighten the foster parents' fear, the record supports a finding that Freeman's stalking was itself a terrifying ordeal for the foster parents.
 C. Motion for Acquittal of Residential
Burglary
 Freeman challenges the denial of her motion for acquittal on the residential burglary charge brought at the close of the prosecution's case. The court did not err in denying her motion. The prosecution's theory of the burglary charge was that Freeman intended to facilitate her stalking objective when she entered the residence, and the jury was instructed that stalking was the felony underlying the burglary charge.[12] Freeman argues there was no evidence she intended to commit a felony when she entered the foster parents' apartment, and thus she only committed trespass.
 Burglary is committed when a person enters a house with the intent to commit theft or any felony. (§§ 459.) The defendant need not intend to actually accomplish the felony in the residence; it is sufficient if the "entry is `closely connected' with, and is made in order to facilitate, the intended crime." (People v. Griffin (2001)90 Cal.App.4th 741, 749.) The intent to commit the felony may be inferred from all the facts and the circumstances of the case. (People v. Kwok (1998) 63 Cal.App.4th 1236, 1245.)
 The evidence is sufficient for the jury to reasonably infer Freeman's entry into the foster parents' residence on October 11 was closely connected with and made to facilitate her stalking of the foster parents. Prior to October 11, Freeman had already commenced her surveillance of the foster parents and she had formulated plans to remove E. from the foster placement without authorization. She had asked Oakley to press the Calvary Chapel youth pastor for information about E., and had repeatedly asked Oakley to help her "steal" E. from the foster family.[13] She had broken into the school to retrieve the foster parents' address from the computer and had been watching and following the foster parents for "quite some time." When Freeman exited the residence on October 11, she was elated that she had taken pictures and acquired information about the foster mothers. From these circumstances, the jury could infer that Freeman entered the residence with a view to obtaining whatever information she could to advance her plan to interfere with the foster placement, which included intimidating the foster parents. Although the activity that first frightened the foster parents did not occur until after the October 11 entry into the apartment (when the foster parents detected they were being followed), the jury could reasonably infer that from the inception of her surveillance efforts in early October Freeman intended to engage in whatever was necessary to carry out her goal of disrupting the foster placement, including following and frightening the foster parents. Based on this inference, there was sufficient evidence to support a finding that Freeman entered the apartment to facilitate her plans to commit stalking by harassing and intimidating the foster parents.
 Freeman asserts the evidence shows her only intent when she entered the residence was to determine whether her daughter was safe. The jury was not required to draw this inference. Although Freeman told Oakley she wanted to know if her daughter was all right, Freeman entered the residence when it appeared her daughter was not at home. From this, the jury could infer Freeman knew she would not acquire any immediate information about her daughter's well-being, and that her intent was to try to get information to effectuate her plans to harass the foster parents. As noted, although Freeman's overall goals may have been to carry out what she thought was necessary to protect her daughter and to regain custody, this did not preclude an inference that she intended to unlawfully stalk the foster parents to accomplish her goals.
 Given the sufficiency of the evidence to support the intent to commit stalking, we need not discuss Freeman's contention that the evidence was insufficient to show she intended to commit theft when she entered the residence. For the same reason, we also summarily deny Freeman's petition for writ of habeas corpus regarding the residential burglary conviction, which solely challenges the sufficiency of the evidence to show the intent to commit theft.[14]
 D. Solicitation to CommitKidnapping 1. Propriety of Solicitation to CommitKidnapping Charge
 Freeman argues she could not properly be charged with solicitation to commit kidnapping because the more specific statute of child abduction applies to the facts of this case.
 Freeman was charged with a violation of section 653f, subdivision (a), which makes it a crime to solicit another person to commit or join in the commission of certain specifically enumerated crimes, including kidnapping, and with the intent that the offense be committed. Kidnapping is defined in section 207, subdivision (a) as the taking and carrying away of a person by force or fear. Child abduction is defined in section 278 as the malicious taking of a child by a person not having a right to custody with the intent to detain or conceal the child from the lawful custodian. Child abduction is not one of the crimes enumerated in the section 653f solicitation statute.
 Generally, a defendant may not be prosecuted under a general statute when the Legislature intends that a more specific statute with a less severe penalty govern the proscribed conduct. (People v. Jenkins (1980)28 Cal.3d 494, 501-506; Mitchell v. Superior Court (1989)49 Cal.3d 1230, 1250; People v. Jones (2003)108 Cal.App.4th 455, 463.) This "special over the general" preemption rule applies when (1) each element of the general statute corresponds to an element of the specific statute, or (2) "it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute." (People v. Watson
(1981) 30 Cal.3d 290, 295-296; People v. Coronado
(1995) 12 Cal.4th 145, 153-154.) This rule is designed to ascertain and carry out legislative intent, and the enactment of "a specific statute covering much the same ground as a more general law" typically reflects an intent that only the specific provision apply. (People v. Jenkins, supra,28 Cal.3d at p. 505.)
 Freeman's contention that the child abduction statute precludes prosecution for solicitation to commit kidnapping is misplaced. The two statutes do not govern the same conduct because the solicitation statute does not include child abduction in the list of enumerated crimes for which solicitation culpability may be imposed, and the child abduction statute does not cover solicitation activity. Freeman could not be charged with solicitation to commit child abduction because there is no such offense in the California Penal Code, and she could not be charged with child abduction because she did not steal E. Thus, it is not possible that the Legislature intended solicitation to kidnap a child to be governed by the child abduction statute, because the child abduction statute does not extend to solicitation activity and the solicitation statute does not extend to child abduction. Freeman's argument premised on the existence of a more specific statute is unavailing.
 2. Motion for Acquittal of Solicitation toCommit Kidnapping
 Freeman contends the trial court should have granted her motion for acquittal of the solicitation to commit kidnapping charge because (1) both she and Oakley were entitled to immunity from culpability for the kidnapping of Freeman's own child from foster parents, and (2) there was no evidence of Freeman's intent that Oakley use force or fear.
 a. Parental Immunity from Kidnapping
 Freeman contends that she could not properly be convicted of solicitation to commit kidnapping of her own child because there was no evidence of the existence, or service on her, of a court order denying her the right to custody.
 In Wilborn v. Superior Court (1959)51 Cal.2d 828, 830 (Wilborn), the California Supreme Court noted that "`[i]n the absence of an order or decreeaffecting the custody of a child, it is generally held that a parent, or one assisting such parent, does not commit the crime of kidnapping by taking exclusive possession of the child.'" (Italics added.) After recognizing the majority view that a person assisting a parent with a kidnapping is not culpable if the parent could not be culpable, theWilborn court adopted the minority rule that for policy reasons culpability should be imposed on a nonparent. (Id. at pp. 830-831.) The court premised its conclusion on a concern for the "mental anxiety of the parent who loses the child . . . [when] the child passes into the hands of one having no parental obligations toward the child." (Id. at p. 831.) The Wilborn court concluded that "whatever may be the right of one parent, in the absence of an order for child custody, to invade the possession of the other to take or entice away their mutual offspring, such right may not be delegated to an agent." (Ibid.)
 We need not address Freeman's contention that theWilborn rule, declining to extend parental kidnapping immunity to nonparents, should not apply to a situation where a parent solicits a nonparent to take a child from foster
parents. Even assuming that Oakley would be immunized from culpability for kidnapping if Freeman had the right to take her child (and thus Freeman would in turn be immunized from the crime of solicitation to commit kidnapping), the fact that at the time of the charged conduct CPS had placed E. with the foster parents created the practical equivalent of an "`order or decree affecting the custody of a child'" (Wilborn,supra, 51 Cal.2d at p. 830), which inhibited Freeman's parental right to take her child.
 Consistent with this conclusion, the child abduction statute provides that CPS has the right to physical custody whenever it has taken protective custody "bystatutory authority or court order." (§§ 277, subd. (e), italics added; see also People v. Ryan
(1999) 76 Cal.App.4th 1304, 1314 [general legal right to custody does not equate with right to physical custody for purposes of child abduction statute].) Regardless of the stage of the dependency proceedings or the issuance of any specific dependency court order, Freeman knew that her daughter had been removed from her physical custody and that she could not regain that custody without permission from the authorities. Accordingly, Freeman could properly be held criminally liable for her efforts to take her daughter from the foster placement without authorization. To hold otherwise would defeat the Legislature's intent to protect the welfare of children who are removed from their parents' physical custody and placed in foster care during the pendency of dependency proceedings.
 Alternatively, even if we were to construe the record as failing to show Freeman had lost her custody rights, Freeman could be culpable under the rule extending kidnapping liability to a parent with custodial rights who takes his or her child for an illegal purpose. "[W]hile a [parent] entitled to custody ordinarily cannot kidnap his [or her] own child, [the parent's] right to physical custody ends when he [or she] exercises it for a purpose known to be illegal. . . . [¶] [S]uch a parent is liable for kidnapping if he or she exercises custodial rights for an illegal purpose." (People v.Senior (1992) 3 Cal.App.4th 765, 781.) Because E. was in protective custody, Freeman could properly be liable for solicitation to commit kidnapping based on her illegal purpose of depriving CPS of its legal right to temporary custody of E. (See §§ 277, subd. (e) [providing that protective custody makes CPS a lawful custodian and gives CPS a right to physical custody], 278.5 [defining the crime of depriving a lawful custodian of right to custody or visitation].)
 b. Intent to Use Force or Fear
 Freeman asserts her acquittal motion brought at the close of the prosecution's case should have been granted because there was no evidence she intended that Oakley use force or fear when taking E., but only intended that Oakley persuade E. to voluntarily leave her foster parents. Oakley testified that Freeman discussed the use of an "escort" who assists with combative, uncooperative teens, and that Freeman described plans where Oakley would convince E. to approach Freeman's vehicle and Freeman would then "`take'" E. or "`take off'" with E. From Freeman's discussion of the use of an escort, the jury could reasonably infer that Freeman anticipated resistance from E. and that she was trying to devise ways to overcome that resistance. Further, the jury could reasonably interpret Freeman's references to taking E. or taking off with E. as meaning that, if necessary, Freeman intended to use force or fear to make E. enter the vehicle. Drawing these inferences, the jury could conclude that Freeman wanted Oakley to help her take E. by force or intimidation once E. was near Freeman's vehicle. There was sufficient evidence to support a finding of Freeman's intent that Oakley use force or fear.
 Because there was sufficient evidence of intent to use force or fear, we need not consider whether a minor in protective custody, such as E., is incapable of giving legal consent, thus altering the requisite force or fear element for kidnapping. (See In re Michele D. (2002)29 Cal.4th 600, 607-612.) *Page 532 
 DISPOSITION The judgment is reversed. The petitions for writ of habeas corpus are denied.
 McDonald, J., and O'Rourke, J., concurred.
[2] People v. Marsden (1970) 2 Cal.3d 118
[84 Cal.Rptr. 156, 465 P.2d 44].
[3] The discussion giving rise to this minute order was not transcribed.
[4] On appeal, Freeman does not contend her May 2004 handwritten motion was intended to be a peremptory challenge.
[5] In Vasquez, the appearance of bias arose from a family relationship between a defendant and two employees in a large prosecutor's office. (People v.Vasquez, supra, 39 Cal.4th at p. 65.) To support its conclusion that there was no constitutional violation, theVasquez court noted that the United States Supreme Court has generally not imbued situations involving the potential bias of a judge based on kinship or other personal connections (as opposed to a judge's direct pecuniary or personal stake in a case) with constitutional significance, but rather has left "that line-drawing process to state disqualification and disciplinary law, with only `the most extreme of cases' being recognized as constitutional violations." (Id. at pp. 63-65.) This analysis is consistent with the conclusions in the federal cases that something more than the "mere" appearance of judicial bias is necessary to trigger a constitutional due process violation.
[6] Such a situation might arise, for example, when a judge was disqualified because of friendship with a particular person, and it is later discovered that the person was misidentified and was not in fact the judge's friend.
[7] For convenience, we shall subsequently refer to the statutory provisions governing judicial disqualification (Code Civ. Proc., §§ 170 et seq.) without referring to the Code of Civil Procedure.
[8] Although Freeman may not rely on the statutory disqualification scheme to obtain reversal for judicial bias, the scheme — which is designed to further due process by protecting the integrity of the judicial process — is a helpful guidepost to our constitutional analysis.
[9] Section 170.4, subdivision (a) provides that a disqualified judge may perform the following duties: "(1) Take any action or issue any order necessary to maintain the jurisdiction of the court pending the assignment of a judge not disqualified, [¶] (2) Request any other judge agreed upon by the parties to sit and act in his or her place, [¶] (3) Hear and determine purely default matters, [¶] (4) Issue an order for possession prior to judgment in eminent domain proceedings. [¶] (5) Set proceedings for trial or hearing. [¶] (6) Conduct settlement conferences."
[10] Subsequent statutory references are to the Penal Code unless otherwise specified.
[11] After Freeman committed the alleged offenses in 2002, the language of section 646.9 was amended effective January 2003, apparently to clarify some of the elements. Subsequent references to section 646.9 are to the former version effective in 2002.
[12] The jury was instructed: "Every person who enters a building with specific intent to commit stalking, a felony, is guilty of the crime of burglary. . . ."
[13] Oakley testified that Freeman's requests that she help "steal" E. occurred both before and after October 11.
[14] When arguing for acquittal of the burglary charge, Freeman's trial counsel asserted that "obviously, there [was] no theft" underlying the burglary. A theft theory was never presented to the jury, and the jury was expressly instructed that the felony underlying the burglary charge was stalking. In denying Freeman's motion for acquittal on the burglary charge, the trial court noted that some information may have been retrieved from the residence, but the court did not state there was evidence of theft as the underlying felony. Freeman's appellate and habeas arguments pertaining to theft do not correlate with the manner in which the case was presented to the jury. *Page 533